In the matter of the WATER COMMISSIONERS, &c.

Owners of land, fronting on the Harlem river, have no greater rights to the
water or navigation, than more distant proprietors. The corporation of the
city of New-York own the land from high water-mark to low water-mark;
and all beyond is under the power of the legislature.
A total stoppage of the navigation of the Harlem river would amount to a pub-
lic nuisance.

*February,*
*1839.*

*Harlem*
*river.*
*Public nui-*
*sance.*

THE commissioners, appointed under the act for supplying
the city of New-York with pure and wholesome water, re-
quired land fronting on the Harlem river, belonging to William
B. Lawrence, in order to carry over their proposed aqueduct
or low bridge; and appraisers under the act had valued such
land. Their report now came in for confirmation. They had
simply allowed for the worth of the lots required to be taken;
and made no mention of damage connected with any supposed
water-right.

Affidavits were presented on the part of Mr. Lawrence. His
deposition showed, that his land was situated on the Harlem
river, having a front of nearly one thousand feet on the river;
and the whole of his land, except what was taken for the
aqueduct, laid north of the proposed crossing-place of the low
bridge or dam about to be erected by the water commission-
ers; and that the Harlem river, at the place of the proposed
crossing, was six hundred and twenty feet wide, and the chan-
nel three hundred feet in width, and from twenty to twenty-
five feet deep. The said river was always navigable from the
East River, with schooners, sloops and other vessels, far beyond
the deponent's property and above the said crossing-place;
that Macomb's dam was the only obstruction; that since the
said dam had been partially removed, the said river had been
constantly navigated above the crossing-place aforesaid to
Berrian's landings, an ancient public landing-place of the town
of Westchester and other places, by vessels of the description
usually navigating Long Island Sound and the North River

and having masts exeeding eighty feet in height.   Also, that,
by the plan of crossing the Harlem river, for which a contract
had been  actually entered into by the Water Commissioners,
it was intended to erect an impassable dam  across  the whole
channel thereof, to  divert  the whole  water  of  the  river from
the channel  and to cause  it to flow through an  archway one
hundred and twenty feet wide, and sixty-five  feet  high at its
greatest elevation over the flats, where the water was then only
from one to two feet deep.   And the deponent was informed and
believed that  the proposed plan of crossing the Harlem  river
would entirely destroy the river for all purposes of navigation
north of the said crossing-place ;  and that  the present  plan of
crossing  the river was  adopted without  any reference  to  the
navigation, as was admitted to the deponent by John B. Jervis,
the chief engineer of the water works, who further stated that
no modification of the said plan could  preserve the navigation
for vessels having standing  masts and  spars.   And also, that
the  appraisers  had wholly omitted  to  take into consideration
the damage to the deponent from the  destruction of  the  navi-
gation by the erection of the proposed low bridge.

   George  C.  Schaeffer, civil  engineer, deposed (inter alia)
that he was well acquainted with the place where it was  pro-
posed to carry the Croton aqueduct across the  Harlem river ;
and had also examined the printed plan, with the maps of  the
bridge to support iron pipes, proposed  to  be built on  the said
river, and for which, as the deponent was informed, the water
commissioners had made a contract.   And the deponent verily
believed  that the building of the bridge, to support iron pipes
in the manner  proposed, would  destroy the river  for  all  the
general navigable  purposes  for which it could  be used, inas-
much as, 1st.  The  whole  tide  current  must, necessarily, be
forced  through an  opening of one  hundred  and  twenty feet,
which space, in the opinion of the deponent, was utterly insuf-
ficient for the purpose, and must cause, through such opening,
so violent a current  that the said bridge would be  impassable
either against  the current  or with the current, at all times, ex-
cept within a few  minutes of slack  water.   2d.  That such
opening, being proposed to be over  the flat or deposit on  the
New-York side of the river, a  new  channel way  must  be
formed (the natural channel being dammed up and filled in by

the embankment of the said bridge) by the removal of the said deposit, which, as deponent was informed and believed, was proposed to be done by loosening the same and allowing it to flow off and settle in other parts of the said river ; and deponent believed that this would create shoals where there was then deep water ; and, 3d. That, inasmuch as it was proposed to allow an arch of only sixty-five feet in height at the centre, vessels having masts and spars of about fifty feet in height and under, only, could, by the most dexterous management, pass under the same with safety, even at slack water.

Mr. *D. B. Tallmadge* and Mr. *Crook*, appeared in support of the report ; and, Mr. *J. P. Hall* and Mr. *Raymond*, against it.

THE VICE-CHANCELLOR :—I do not understand that Mr. Lawrence raises an objection to the mere amount awarded to him for the land really taken, but objects, on account of collateral damage not being allowed ; i. e., future damage from a supposed obstruction to the navigation of Harlem river by means of the erection of the proposed low bridge.

Harlem river is a navigable stream. The tide ebbs and flows through it. It is an arm of the sea , and where land is bounded by an arm of the sea or a navigable river, the owner of such land has *prima facie* a right only to high water-mark. All beyond, belongs to the sovereign or state.

This was so under the colonial government ; and hence, in the charter of the city of New-York, known as Governor Dongan's charter, in the year one thousand six hundred and eighty-six, the crown granted to the mayor, aldermen and commonalty of the said city of New-York, " all the waste, vacant, unpatented and unappropriated lands lying and being within the said city of New-York, and on Manhattan's Island, extending and reaching to the low water mark, in, by and through all parts of the said city of New-York and Manhattan's Island aforesaid ; and their jurisdiction is declared to extend to low water-mark all round the island, with power to the corporation to take in, fill up, lay out and build upon the ground or make use of in any other manner," as far into the rivers that encompass the island as low water-mark.

Queen Anne's charter in 1708 contains a grant of land on the Long Island shore, between high water and low water-mark, extending from the Wallabout to Red Hook, and also the right to establish ferries between the city of New-York and the Long Island shore, and this is followed by the more extensive charter of George the Second, in 1730, reciting and confirming the two former grants, and granting to the corporation the addition of four hundred feet below low water-mark, in the Hudson and East rivers, and extending the jurisdiction of the city, for municipal purposes, to the Westchester shore of the Harlem river.

There is nothing in these charters which give to riparian owners the absolute right of pre-emption, though it is understood they have the preference as grantees or purchasers of the soil under water in front of their upland, whenever the corporation think proper to issue grants for land within the bounds of their ownership under the charters above mentioned, or whenever the commissioners of the land office, or state legislature, shall make or authorize similar grants of land which still belong to the state.

With respect to Harlem river, it appears the corporation owns the soil, from high to low water mark, on the shore in question. Individuals owning lands fronting thereto have no greater rights as respects the navigation of the river, than owners whose lands are situated a distance therefrom. Every citizen has an equal right to the use of the waters, and to keep the navigation open and unobstructed.

Mr. Lawrence insists that the navigation will be, in effect, stopped by the construction of the proposed low bridge; but the authority of the water commissioners, to bring the waters of the Croton river to the city of New-York, is plenary; and sufficient to allow them to pass their works over the Harlem river. The legislature have authorized it. The question itself has been submitted to the electors of the city by public ballot; and although the present plan of a bridge for that purpose may vary in some respects from the original proposition, yet the present one is less objectionable than the former, as it would leave the navigation less obstructed.

This is not the first time that the legislature has authorized works in the Harlem river, which have interfered with and

partially obstructed the navigation.   The Harlem bridge and Macomb's dam are instances; but in the grants for those objects, they took care to provide for a free passage for boats and vessels accustomed to navigate there.   In the construction of Macomb's dam, however, that provision was overlooked or disregarded, and the dam became a total obstruction, so that vessels could not pass it; and I have recently had occasion to consider this entire obstruction to the navigation a public nuisance.   A bill was filed before me for the purpose of having an injunction to restrain some people of Westchester county from proceeding to abate it as such, by removing a part of the dam, so as to open a passage for vessels through it.   Upon the ground of the unlawfulness of the erection, an injunction was refused.

The legislature, possessed of the sovereign power of the state, may, by express enactment, grant to individuals or corporations the right and privilege of erecting works in or upon public or navigable rivers ; but, in doing so, they should take care to provide, in every act, against a total obstruction of the navigation.   The principles that have applied to Macomb's dam, will also attach to the low bridge of the water commissioners, in case it should be so erected as to cause an obstruction of the navigation for all useful purposes ; and it may, in such an event, be indicted and abated.   The commissioners take the responsibility of their own doings.   If the apprehensions in the affidavit of Mr. Lawrence are realized, he will then have, as will every other citizen, a sufficient remedy ; but he cannot, at this day, claim damages at the hands of the commissioners in anticipation of a public evil.   My conclusion is, that the appraisers have awarded all they were bound to award, for value and damage ; and the report must be confirmed.