## Zimmerman *against* The Union Canal Company.

The obstruction or deepening of the waters of a stream which is a public highway, by authority of an Act of Assembly, is not the subject of a claim of damage by the owner of the adjoining land for an injury done to or destruction of, a fording across the stream.

Damages done to land by the construction of the Union Canal, and works appurtenant to it, must be estimated as of the time when done; and a subsequent purchaser of the land cannot maintain a proceeding to recover damages done to him.

APPEAL from the decision of the Quarter Sessions of *Lebanon* county.

Jacob Zimmerman against The Union Canal Company.

At January sessions 1840, the plaintiff presented his petition to the court setting forth that he was seised of a tract of 140 acres of land, &c., in Anville township, Lebanon county, which had been injured by the erection of a dam, constructed by the defendants for their works, whereby the water was swelled upon the plaintiff's land, and a fording adjoining the same, which he was accustomed and entitled to use, was injured. He laid his seisin as of the 13th of March 1837, and the commencement of the erection of the dam as of the 1st of March 1837. A *venire facias* was awarded to the sheriff of Lancaster county, who, upon the 4th of April 1840, took an inquisition, in which the inquest found that the plaintiff had sustained damages by reason of the overflowing of his land to the amount of $200, and by reason of destroying the ford to the amount of $130, making the entire finding $330.

This inquisition having been returned at April sessions 1840, a confirmation *nisi* was entered, and exceptions being filed, a rule was obtained on behalf of the defendants to show cause why the inquisition should not be set aside.

The following are the exceptions filed:

1. The petitioner, Jacob Zimmerman, was not seised or possessed of the premises injured or damaged, when the works of the Union Canal Company, which caused the said injury or damage, were erected; but became the owner thereof by purchase, many years subsequent to the erection of said works.

2. The jury have allowed damages for injury to a fording over the Swatara creek, occasioned by a swelling of the waters of said creek, and increasing their depth; which swelling of the waters of said creek, and increasing their depth, was occasioned by the erection of a dam by the Union Canal Company of Pennsylvania,

about a mile below the premises of the said Jacob Zimmerman, which dam did not touch the said premises, nor were they touched by any other of the works of said company; and the said Swatara creek was, at the time of the erection of said dam, and has been ever since the year 1771, and still is, a public highway.

3. The petition or complaint of said Jacob Zimmerman sets forth, that on or about the first day of March 1837, the Union Canal Company of Pennsylvania located their canal and other works on the land in question, and then and there did construct a dam across the Swatara creek, by which the injuries complained of were done; whereas in fact, the said company never did locate their canal nor any of their works on said land, but erected the same about a mile below the said land; the jury have therefore assessed damages for matters different from those set forth in the petition or complaint.

4. The premises, for injuries to which the said Jacob Zimmerman complained, were held by the said Jacob under a conveyance from his father, Godfried Zimmerman, dated 13th of March 1837; and the said Godfried at the same time with the said Jacob, applied for, and obtained from the court, a venire to the sheriff of Lancaster county, to summon a jury to assess damages claimed by him, the said Godfried, to the land still owned by the said Godfried; which land, along with the premises so conveyed to his son Jacob on the 11th of March 1837, as above mentioned, formed one entire tract, the whole of which was owned by the said Godfried at the time the works of the Union Canal Company, that occasioned the injury (if any), were erected; and continued in his ownership until 1837, about eleven years after said works were erected; one claim was thus split or divided into two, and the company subjected to additional costs, although all the injuries to the whole of the premises thus originally owned by said Godfried were caused by the same works of the said company; and the jury summoned in the case of the said Godfried, assessed damages against the said company for the injuries complained of by him; thus, in fact, causing two verdicts or assessments of damages for one cause of action or complaint.

By the evidence adduced in support of the exceptions, it appeared that in the year 1827, the Union Canal Company of Pennsylvania constructed a dam across the Swatara river, or creek, about a mile below the premises alleged to have been injured, which swelled back the water in the stream, where it passed along, and formed the boundary of the premises alleged to have been injured. The fording of the creek complained of, was where a road crossed it — a road that leads from the Lebanon and Harrisburg turnpike at Light's mill to Hanover. The record of this road was not found; but it was stated to have been worked by the public, and it was recollected as a road in use as far back as 1814. The road crossed the Swatara at the lands of the plaintiff; whose lands, however,

did not lie on both sides of the stream. The plaintiff went into possession of the land alleged to have been injured, subsequently to the completion of the dam, and probably not long before 1837, and received the title therefor on the 13th of March 1837. His father, Godfried Zimmerman, owned a large tract of land where the dam was erected, of which he conveyed to the plaintiff the one hundred and forty acres which he now owns; and the father still owns the residue, and has instituted proceedings and obtained a judgment for the damages which he alleged he sustained by reason of the injury done to the part owned by him.

The Swatara was declared a public highway as far up as Peter Ritter's mill-dam, (now Weidman's forge) by Act of the 9th of March 1771. And the Act so declaring it a public highway, authorizes the commissioners therein named " to remove all obstructions then erected, or that might be thereafter erected therein, and to scour, enlarge, straighten, and deepen the same in any part or place where it shall appear most convenient for opening, making anew, or improving the channels; and also to cut, blow up, remove, or take away all trees, rocks, or beds of gravel, sand, or mud, wears, dams, baskets, grounds, stones, or any other impediment or obstruction whatever; and to form, make, erect and set up any dams, pens for water, locks, or any other works whatsoever, which they shall think fit and convenient to answer the purpose aforesaid; and to alter, repair, or amend the same as often as it shall be necessary or convenient; and also to appoint, set out, and make tow-paths or ways for towing, hauling, or drawing of boats, vessels, or other small craft and rafts of any kind whatsoever, in, upon, or through the said rivers and streams, which said paths shall be free and open to all persons whatsoever having occasion to use the same; and from time to time, and at all times hereafter to do, execute, and perform all and every other matter or thing, in the said rivers and streams, necessary or convenient for making, maintaining, and continuing the navigation in the same."

By the Act, passed 2d of April 1811, entitled an Act to incorporate the Union Canal Company of Pennsylvania, the former companies for the construction of a canal and navigation between the Susquehanna and Schuylkill, and the Schuylkill and Delaware, were consolidated under the title of "The Union Canal Company of Pennsylvania," and the company so incorporated was authorized to open a complete canal and lock navigation from one or more points on the river Susquehanna to the tide water of the Schuylkill or the Delaware, or both, or by erecting small wing-dams to raise the water of the river Schuylkill, and taking the water on either side of and out of the said river, by means of a wing-dam, canal, lock, or other device, or by taking the water of the said river at any place or places which to them may seem most suitable on either side of the same, and thence to conduct the water

thereof, by means of a canal, in such route as they shall find most practicable, economical, and most conducive to the general objects of the proposed navigation, down to the tide water of the said river Schuylkill, or by means of canals, locks, or any other suitable means and devices, to continue at any time hereafter, during the continuance of the powers thereby granted, the navigation from Reading, or any other place, through the interior country, on either side of the river Schuylkill, and by making use of the waters of the said river Schuylkill, or of the Maxatawney, Perkiomen, French creek, or any other creeks or streams on the intended route of the said canal, to a proper place of entry into the river Schuylkill or Delaware, or both, on the north side of Philadelphia: and to make such and so many locks, basins, reservoirs, collateral cut or cuts, and channels, as they may think proper, and to erect one or more wing-dams from either side of the said river Schuylkill, at such place or places where they shall commence any of their canals, extending up the stream, but not more than one third across the same, nor so as to render the navigation thereof dangerous, by forcing boats or rafts on the opposite shore, or on rocks or shoals, which might otherwise have been passed in safety."

The 12th section of the Act provides, that whenever the said canal shall cross any public or private laid out road or highway, or shall divide the grounds of any person into two parts, so as to require fords or bridges to cross the same, the said president and managers shall be at liberty, as they may think proper at any time hereafter, either to build bridges, or to cause fords to be rendered practicable and fit for the passage of carts and wagons: and the bottom of the said fords shall be made of stones or wood, and the water of any such fords shall not be deeper than thirty inches, and the breadth of such ford shall be twelve feet at the least, and whenever any such bridge or bridges shall have been erected, either to repair the same, or cause a ford to be made in lieu thereof. The 13th section provides, " that, if in the opinion of the president and managers of the Union Canal Company of Pennsylvania, the introduction and use of any different mode or device, or any improvement hitherto adopted, or such as may hereafter anywhere be invented in the system of internal navigation, will be beneficial, it shall be lawful for them to make use of, and employ the same from time to time; and, as well for such purposes as for the necessary prosecution of the same, the said president and managers, and their engineers, workmen, and labourers, to enter into and upon all and singular, the land and lands intended or supposed to be the proper route for the said canal and lock navigation: and shall have the power to purchase so much land along the tract of the canal, and adjacent thereto, and tenements, mills, mill-ponds, water, water courses, or other real hereditaments, as shall, in their opinion, from time to time be necessary; and in default

I.— 2 E

[Zimmerman v. The Union Canal Company.]

of purchasing, it shall be lawful for the Courts of Quarter Sessions, or the Mayor's Court, in the city of Philadelphia, ON THE APPLI-CATION OF THE OWNER of the said ground, or of the president and managers, to appoint three suitable and judicious persons of any neighbouring county, at their discretion, or at the request of either party, to award a *venire*, directed to the sheriff of any adjoining county, to summon a jury of disinterested men, in order to ascertain and report to the court what damages, if any, have been sustained BY THE OWNER OF THE SAID GROUNDS, by reason of the said canal or other works; which report being confirmed by the court, judgment shall be entered thereon, and execution, on motion, may be issued, in case of non-payment of the money awarded, with reasonable costs to be assessed by the court. And it shall be the duty of the jury, in valuing any lands, tenements, or hereditaments, to take into consideration the advantage derived to the OWNER or OWNERS of the premises from the said navigation passing through the same."

The court below set aside the finding of the inquisition upon grounds fatal to the plaintiff's recovery, and delivered the following opinion, which was the subject of review:

PORTER, President.—In regard to so much of the finding of the jury, as relates to the fording, there is clearly error. According to the language of C. J. Tilghman, in *Hughes* v. *Heiser*, "the general principle has been always agreed, that for an obstruction to a public highway, which is a common nuisance, an action cannot be supported but by a person who has sustained some SPECIAL DAMAGE," although it will be immaterial whether it was immediate or consequential. If the plaintiff has sustained any damage in regard to the fording, it is by what would, but for the special enactments in the law, incorporating the defendant, be a nuisance against the public in two respects:—first, by the erection of the dam in the Swatara, a public highway; and secondly, by such dam deepening the water where the road in question crosses it, and thus obstructing the road, which we are disposed to treat as a public highway, under the evidence and admissions in the cause. There is no averment of any special damage sustained by the plaintiff, in consequence of deepening the fording by the swelling of the water from the dam.

The public would have an undoubted right to deepen any of our navigable streams for the purpose of improving the navigation thereof, although such improvement might destroy every ford-ing across them. It is true it is improving one public highway at the expense of another, but the lesser convenience is made to yield to the greater. This the public has an undoubted right to do, in providing for the general good. The control of our streams is an attribute of the sovereignty of the country—part of the "eminent domain" subsisting in the sovereign power, to borrow a term from the civil law.

In *M'Clenachan* v. *Curwin*, (3 *Yeates* 373 ; 6 *Binn.* 514) the Supreme Court of Pennsylvania, after affirming the right of the commonwealth to apply a portion of every man's land for the purpose of laying public roads and highways, without compensation, such compensation having been originally made in each purchaser's original grant, say, " but it is objected that even if the legislature might do this themselves, yet they could not grant the right of doing it to individuals or a corporate body for their own emolument, so as to deprive the inhabitants or travellers of the free use of the road, by imposing tolls or other restrictions in the use of it.    To this it may be answered that such an artificial road, (the Philadelphia and Lancaster Turnpike) being deemed by the legislature a matter of general and public utility, and considering that it was not to be effected but at a considerable expense, and that the expense could not be defrayed, nor expected to be defrayed in the ordinary way by the inhabitants of the several townships through which the road was to run, they divide this mode of accommodating the public with such a road at the expense of private individuals, who, from a prospect of deriving some small profit to themselves, might be induced to do it. It was immaterial to the public, whether it was done by a general tax, to be laid on the people at large, or by the gradual payment of certain specified sums, by way of tolls upon those who used the road only : the latter being considered as the most equal mode of defraying the charge of making and keeping such road in repair.    For although every man has a right to the free use of a public road, yet every member of the community may be taxed for making that road in any manner that the legislature may think reasonable and just."

The same doctrine has been applied to the improvement of our streams.    The Union Canal Company, as is seen, has been authorized to improve the navigation of the Swatara and Schuylkill rivers.    The Schuylkill Navigation Company has also been authorized to improve, and has improved the navigation of the Schuylkill from Mill creek to Philadelphia.    The Lehigh Coal and Navigation Company have been authorized to, and have improved the navigation of the Lehigh from the Great Falls to Easton. Maurice Wurts was authorized to improve the Lackawaxen from the Dyberry Fork to the mouth, and the work has since been done by the Delaware and Hudson Canal Company, in virtue of a transfer of the rights of Maurice Wurts, sanctioned by a subsequent Act of Assembly.    The river Monongahela is now being improved by a company incorporated for that purpose.

The rules of the common law of England in regard to the rivers and the rights of riparian owners, do not extend to this commonwealth, for this plain reason, that rules applicable to such streams as they have in England, above the flow of the tide, scarcely one of which approximates to the size of Swatara, would be inapplicable to such streams as the Susquehanna, the Alleghany, the

Monongahela, the Ohio, the Delaware, and many of their tributaries. *Carson* v. *Blazer*, (2 *Binn.* 475); *Shrunk* v. *The Schuylkill Navigation Co.*, (14 *Serg.* & *Rawle* 72); *Ueberroth* v. *The Lehigh Coal and Navigation Co.*, (7 *Hazard's P. Reg.* 292). The law of Pennsylvania therefore seems settled, that the common law doctrine of England, which only deems a river navigable or a public highway as high up from the mouth as the tide flows, cannot be applied to our large streams, such as the Ohio, Alleghany, Delaware, Schuylkill, Susquehanna or its branches; nor does the soil under such rivers belong to the riparian owners, but to the commonwealth.

The act incorporating the Union Canal Company of Pennsylvania, like most similar laws, provides a mode by which the claims of all persons injured shall be examined and decided. It is remarkable, however, that in the act in question, perhaps in it alone of all the enactments on the subject, no appeal is given to either party from the decision of the inquest. Still, the mode designated in the Act must be pursued in the assessment of damages for injuries committed. In a case of a similar nature, or growing out of a somewhat similar law, (*The Lehigh Bridge Co.* v. *The Lehigh Coal and Navigation Co.*, 4 *Rawle's Rep.* 23) Chief Justice Gibson says, " The legislature evidently meant to provide for nothing that was not remediable at the common law, and on the other hand it was intended that every common law injury should be redressed by the statutory remedy ;" and such undoubtedly is the true construction of the Act in question.

If the spirit and meaning of the 12th section of the Act, incorporating the defendants, covers the case of a public road crossing the stream of the Swatara, where it may be flooded by a feeder dam, then the company would be compellable to erect a bridge, or to construct a ford, agreeably to the provisions of that Act; and the Court of Common Pleas of the proper county would, under the powers given them to supervise and control corporations, compel them so to accommodate the public. The court express no opinion on this subject, as that point does not necessarily arise in the present cause, but refer to it to show that if the public have a claim on the defendants, they are not without remedy. So, too, in case the canal to be constructed shall divide the lands of any individual into two parts. In such cases, they are bound to construct a ford or bridge for every such individual; and the courts would compel them to do so. This, however, is not the case of the canal dividing the lands of an individual, nor even the case of rendering a ford over a public highway, which had previously divided the lands of an individual, less practicable. In either of which cases it may be worthy of consideration whether, so far as the Act applies, the proper course is not a specific performance of the directions of the Act, rather than a claim for damages for not conforming to them. It seems, however, to be but in accordance with the decisions made upon the subject, that

it is one of the incidents to holding property on one or both sides of a navigable stream that the party is subject to, any inconvenience that may arise from deepening the channel, or otherwise improving the navigation of such stream, is to be submitted to, without any right to damages therefor, except as such improvement may flood or drown their lands.   See *Shrunk* v. *The Schuylkill Navigation Co.*, and *Ueberroth* v. *The Lehigh Coal and Navigation Co.*, before cited; and see also, *Commonwealth* v. *Fisher*, (1 *Penn. Rep.* 467,) in which latter case Justice Huston, in delivering the opinion of the court, says, " all within the channel of the river, is a public highway, except the islands.   The state, for the purpose of improving the natural channel, or making an artificial one, may make it deeper in some parts, and drain or make shallow other parts; or it may raise dams partially or entirely across the river, and thus swell the water, and this may constantly or occasionally cover a spring rising below high water mark; or may deepen the water at the outlet of a spring above high water mark, and thus occasion it to be covered oftener with back water.   All this it may do; and he who used the water of that spring, MUST SUBMIT TO IT AS AN EVIL, INCIDENT, LIKE MANY OTHER EVILS AS WELL AS ADVANTAGES, TO A SITUATION ON THE BANK OF A LARGE NAVIGABLE STREAM."   And again, in the same case, " the state never sold any land below high water mark."

C. J. Tilghman, too, in *Shrunk* v. *Schuylkill Navigation Company*, says, " as for the soil over which our great rivers flow, it has never been granted to any one, either by William Penn or his successors, or the state government.   Care seems to have been taken from the beginning, to preserve the waters for public uses, both of fishery and navigation; and the wisdom of that policy is now more striking than ever, from the great improvements in navigation already made, and others in contemplation, to effect which, it is often necessary to obstruct the flow of the water in some places, and in others to divert its course.   It is true that the state would have had a right to do these things for the public benefit, even if the rivers had been private property; but then compensation must have been made to the owners, the amount of which might have been so enormous as to have frustrated, or at least checked, these noble undertakings."

The remaining objection, that the plaintiff was not the OWNER of the premises at the time of the erection of the dam, is equally fatal to the proceedings.

The term OWNER is that used throughout the Act.   It is to the owner at the time of the commission of the injury, that damages are to be awarded.   In *The Schuylkill Navigation Co.* v. *Thoburn*, (7 *Serg. & Rawle* 421) C. J. Gibson says, " the material inquiry is, at what point of time were the jury to estimate the damage as having been suffered?   INDISPUTABLY AT THE TIME WHEN THE INJURY COMPLAINED OF WAS COMPLETE, which was the

moment the dam was finished, or rather when the obstruction, by swelling the water, permanently produced its most injurious consequences." Again, " Now, here the injury to be redressed was one done to the REALTY; but altogether unlike a nuisance, for the continuance of which repeated actions may be brought, in each of which damages may be recovered for the time intervening between the inception of the preceding suit, and the impetration of the writ in the cause which is then tried. The compensation was to be prospective as well as retrospective; but to be estimated with reference to the time when the injury was committed. It was, in fact, to be the price of a privilege to swell the water to a particular height for an indefinite time. Now this price was due the moment the privilege was entered upon, and the price could be ascertained; which was obviously the time when the obstruction was first completed. The jury were therefore to ascertain what was then due; and the amount clearly could not be enhanced, or in any way affected by subsequent injuries, the CONSEQUENCES of the obstruction."

The learned Judge then gives certain examples, and proceeds— " I mention this to show the danger of taking into consideration circumstances posterior to the time when the privilege is fully entered on, and its consequences to the individual to be compensated are ascertained. The jury are to consider the matter just as if they were called on to value the injury at the moment when compensation could first be demanded: they are to value the injury to the property without reference to the person of the owner, or the actual state of his business; and in doing that, the only safe rule is to inquire what would the property, unaffected by the obstruction, have sold for at the time the injury was committed? What would it have sold for as affected by the injury? The difference is the true measure of compensation."

Here Godfried Zimmerman owned the land at the time the alleged injuries were committed. The obstruction, if it injured the premises, injured his freehold. It lessened its value. If he subsequently sold it, the loss occasioned by the deterioration of the value of the land was his. A conveyance of the land, with its appurtenances, would not convey to the vendee a right of action for injuries previously committed upon the land.

Upon both grounds, then, the finding of the inquest is contrary to law, and must be set aside.

*L. Kline* and *Weidman*, for appellant, contended, that as no compensation had been made to the previous owner of the land for the prospective injury done to the premises, the present owner has a right to institute the proceeding, and to recover whatever damage he had sustained during his ownership, as well as for the permanent deterioration of the premises, by reason of the erection of the works of the defendant; and that here the presumption is

[Zimmerman v. The Union Canal Company.]

that the road or way across the stream, at the ford, was in use before it was declared a highway, and the destruction of that ford was an injury for which he is entitled to compensation, the ford being, if not appurtenant to his land, at least a very considerable advantage to it, as it was his route to mill, &c. And that a right of way may exist in an individual through or across a highway to his close. That here the inquisition is to be approved by the court before it can be enforced; and if substantial justice is done, the court will overlook technicalities, and they have ample power over the costs, and the jury have only allowed the father and son together the amount of damages for the injury to the entire property, if there should be any thing in the technical exception taken. *Act incorporating Union Canal Company, sec.* 12; 1 *Binn.* 467; 7 *Serg. & Rawle* 404; 3 *Com. Dig.* 57, *Note d. No.* 1; 2 *Pick. Rep.* 33.

*Pearson,* for appellee, argued that as the plaintiff was not the owner of the property at the time of the erection of the dam in question, he cannot maintain a proceeding to recover damages from the company. That the company is bound to make compensation to the owner for any injury sustained, as well prospectively as retrospectively, in one action or proceeding only, and not to be liable to continued actions or proceedings by the successive owners of the land, only the same owners, as is the case where one individual swells upon the land of another. And that the ford being a public one, on a public road across the stream, which is a public highway, no individual is entitled to recover damages by reason of the water in it being increased. 1 *Yeates* 154; *Act incorporating Union Canal Company, 2d April* 1811, *sec.* 13; 1 *Penn. Rep.* 462; 7 *Hazard's Pa. Reg.* 292; 14 *Serg. & Rawle* 71; 4 *Watts* 439; 1 *Binn.* 468; 7 *Serg. & Rawle* 404.

PER CURIAM.—The opinion of the President of the Quarter Sessions is so full on all the points involved, and it so accurately expresses the sentiments of this court, that we deem it sufficient to refer to it for our reasons in holding that the inquisition was properly set aside.

Judgment affirmed.