## Eaton v. B. C. & M. R. R.

### Aiken v. The Same.

A release of all damages on account of the laying out or construction of a railroad through and over the land of the releasor, does not cover damages occasioned to the remaining land of the releasor by the construction of the railroad over the land of other persons.

The statutes in force from 1849 to 1851, providing for the assessment of the damages of a land-owner whose land was crossed by a railroad, did not authorize the assessors to include the damage which was or might be occasioned to such land-owner by the construction of the railroad over the land of other persons.

A railroad corporation, claiming to act under legislative authority, removed a natural barrier situated north of E.'s land, which theretofore had completely protected E.'s meadow from the effects of floods and freshets in a neighboring river. In consequence of this removal, the waters of the river, in times of floods and freshets, sometimes flowed on to E.'s land, carrying sand, gravel, and stones thereon. *Held*, that this was a taking of E.'s property, within the meaning of the constitutional prohibition ; and that the legislature could not authorize the infliction of such an injury without making provision for compensation.

A railroad corporation constructed their road across the farm of E. Damages were assessed under the statute, and paid to E. E. released

the corporation from damages on account of the laying out of the road over his land. Northerly of E.'s farm there was a ridge of land completely protecting the farm from the effect of floods and freshets in a neighboring river. Through this ridge, the corporation, in constructing their road, made a deep cut, through which the waters of the river in floods and freshets sometimes flowed, carrying, on one occasion, sand, gravel, and stones upon E.'s farm. *Held*, that even if the corporation had constructed their road at said cut with due care and prudence, E. could recover, in an action on the case, such damages as had been caused him in consequence of the corporation's cutting away the ridge north of E.'s farm, and thereby letting the river, in times of freshet, run through this cut and damage E.'s land.

A. owned the farm between E.'s farm and said ridge. The ridge was about twenty feet wide upon the top, and a small part of it in width was included in A.'s farm, the northerly line of his farm being near the southerly edge of the top of the ridge. In all other respects A.'s case was similar to E.'s. *Held*, that even if the corporation had constructed their road at the cut with due care and prudence, A. could recover, in an action on the case, such damages as had been caused him in consequence of the corporation's cutting away the ridge north of A.'s farm, and thereby letting the river, in times of freshet, run through this cut and damage A.'s land.

ACTIONS ON THE CASE, against the Boston, Concord, & Montreal railroad,—one brought by Ezra B. Eaton, the other by Milo Aiken, to recover damages done during the freshet of October, 1869, to their respective farms in Wentworth, and alleged to have been occasioned by the construction of the defendants' railroad.

The defendants were duly incorporated by legislative authority, and constructed their road across the farms of the plaintiffs during the years 1849, 1850, and 1851,—the road having been previously surveyed and located. Damages were duly appraised and paid.

Eaton, on March 24, 1851, after the construction of the road, gave the defendants a warranty deed of that part of his farm on which the road is located, and on the same day executed the following release :

" I, the subscriber, do hereby acknowledge that I have received of the Boston, Concord, & Montreal Railroad the sum of two hundred and seventy-five dollars, in full for the amount of damages assessed to me by the railroad commissioners of the State of New Hampshire, in conjunction with the selectmen of Wentworth, on account of the laying out of the said Boston, Concord, & Montreal Railroad through and over my land ; and I do hereby release and discharge the said corporation from said damages."

Aiken, on November 7, 1849, gave the defendants a warranty deed of that part of his farm on which the road is located. Said deed contains the following clause : " And in consideration aforesaid, I hereby

release said corporation from all damages, direct or consequential, by reason of the constructing, maintaining, and using their railroad on and over the land hereby conveyed, and through my said land." This release, and that executed by Eaton, were printed, save names, amounts, &c., which were inserted in blanks left for that purpose.

Northerly of the plaintiffs' farms, which consist of meadow lands lying on Baker's river, there is a narrow ridge of land, some twenty-five feet or more in height, extending from the high lands on the east westerly to said river, completely protecting said meadows from the effect of floods and freshets in said river. Said ridge is about twenty rods wide upon the top, and a small part of it in width is included in the plaintiff Aiken's farm,—the northerly line of his said farm being near the southerly edge of the top of said ridge. The plaintiff Eaton's farm lies south of said Aiken's. Through this ridge the defendants, in constructing their road, made a deep cut, through which the waters of said river in floods and freshets sometimes flowed; and the damages sued for were occasioned by the waters flowing through said cut, and carrying sand and gravel and stones upon said Aiken's farm, and over and acrosss it to and upon the farm of said Eaton. The plaintiffs claim that the defendants are liable for the damages so occasioned, although they may have constructed their road at said cut with due care and prudence. The defendants say that they are not so liable. The defendants claim that, under the circumstances of this case, the corporation are not liable for any damages accruing to the plaintiff from a proper construction of their road, and that in constructing the same they were only bound to do it in the usual manner, and so as to make the owners of adjoining land reasonably safe, and with ordinary care and prudence, and that they were not bound to preclude the possibility of damage by reason of such construction.

The parties consented that the foregoing questions be determined by the court, and that afterwards either party may have a trial by jury if desired, without prejudice from anything herein contained.

Upon the foregoing facts appearing, and the parties having stated their positions and claims, the court, *pro forma*, ruled that the plaintiffs would be entitled to recover such damages as have been caused them in consequence of the defendants' cutting away the ridge north of the plaintiffs' farms, and thereby letting the river in times of freshet run through this cut and damage the plaintiffs' land; to which ruling the defendants excepted.

*Carpenter* and *Flanders*, for the plaintiffs.

*H. Bingham*, *Burrows*, and *Page*, for the defendants.

SMITH, J. Eaton's case will be considered first.

It is virtually conceded that, if the cut through the ridge had been made by a private land-owner, who had acquired no rights from the plaintiff or from the legislature, he would be liable for the damages

sought to be recovered in this action. It seems to be assumed that the freshets were such as, looking at the history of the stream in this respect, might be " reasonably expected occasionally to occur." The defendants removed the natural barrier which theretofore had com-pletely protected the plaintiff's meadow from the effect of these freshets ; and, for the damages caused to the plaintiff in consequence of such re-moval, the defendants are confessedly liable, unless their case can be distinguished from that of the private land-owner above supposed. Such a distinction is attempted upon two grounds,—first, that the plain-tiff has already been compensated for this damage, it being alleged that the defendants have, by negotiation, or by compulsory proceedings, pur-chased of the plaintiff the right to inflict it ; second, that the defendants are acting under legislative authority, by virtue of which they are en-titled to inflict this damage on the plaintiff without any liability to compensate him therefor.

In support of the first ground, the defendants rely upon the plaintiff's release, and upon the appraisal of damages under the statute.

The release does not support the defendants' claim. The plaintiff released the defendants from damages on account of the laying out of the railroad through and over his land. The damages which the court ruled that the plaintiff would be entitled to recover were not occa-sioned by the laying out of the road over the plaintiff's land, but by the construction of the road over the land of other persons. See *Delaware & Raritan Canal Co.* v. *Lee*, 2 Zabriskie 243. The ruling was, that the plaintiff could recover such damages as have been caused him in con-sequence of the defendants' cutting away the ridge north of the plain-tiff's farm.

The defendants contend that the statute, providing for the appraisal of damages, authorized and required the appraisers to take into con-sideration any and all injury or damage which then, or in the future, might accrue to the plaintiff by reason of the cut through the high ridge, and to include the same in their award ; and that therefore the appraisal and subsequent payment furnish a complete bar to this ac-tion. The plaintiff concedes that, if the appraisers had authority to include this damage in their award, it must be presumed that they did so. See *Aldrich* v. *Cheshire Railroad Co.*, 21 N. H. 359. Whether the appraisers had such authority depends, of course, upon the con-struction of the statute. ` By the statute in force when this railroad was built, it is enacted that the commissioners and selectmen " shall assess the damages sustained by the owners of land in the same way and manner as road commissioners in the several counties are now by law required to do." Comp. Stats., ch. 150, sec. 10. The road com-missioners are to assess the damages sustained by owners of land " as selectmen are required to do." Comp. Stats., ch. 54, sec. 7. And selectmen " shall assess the damages sustained by each owner of the land required for such highway." Comp. Stats., ch. 52., sec. 16 ;—see, also, *Blake* v. *Rich*, 34 N. H. 282, pp. 285, 286 ; *Dearborn* v. *B. C. & M. R. R.*, 24 N. H. 179, 185, 186.

What damages are to be awarded by selectmen to owners of land required for a highway ? Are they restricted to the damages occasioned by building the highway over such owner's land ? or, may they also include the damages done to such owner by reason of the construction of the highway over the land of other persons ? It is desirable, in the outset, to ascertain who are entitled to an award of damages under the statute. The term " land required " might, if used in some connections, be construed to include land injuriously affected as well as land actually crossed by the highway ; but other clauses in the highway statutes render it quite clear that this term is here used in the latter sense. Thus, when a new highway is petitioned for, the selectmen are to give notice " to the owners of the land over which the same may pass." Comp. Stat., ch. 52, secs. 2 and 6. So, if a proposed highway " may pass over lands not in any town, the court shall order notice to be given to the owner thereof." Comp. Stat., ch. 53, sec. 3. In *Kennett's Petition*, 24 N. H. 139, the court (per BELL, J.) said,—" Upon examination of the Revised Statutes we can find no provision for the allowance of damages to any persons but the owners of lands over which the new highway is laid." See, also, *People, ex rel. Newton,* v. *Supervisors of Oneida County,* 19 Wendell 102. No " owner," then, can claim damages under the statute, unless some portion of his land is crossed by the road. If only the owner whose land is crossed can claim damages, it would seem that the legislature intended that the damages to be awarded to him should be confined to the injuries occasioned by the crossing of his own land. It is solely by reason of such crossing that the statute gives him any right to have damages appraised by the selectmen at all. The statute, as construed in *Kennett's Petition*, reads thus : "Those persons, and those only, whose land is actually crossed by the road, are entitled to have their damages assessed by the selectmen." Damages, how sustained ? Damages, for what ? The natural answer is, the damages occasioned by the doing of the act which gives them a right to claim damages,—namely, the building of the road over their own land. The language of the statute is broad enough to include actionable damage to the remaining land of an owner by reason of the building of the road over a portion of his land (see *Dearborn* v. *B. C. & M. R. R.*, 24 N. H. 179, pp. 185–187) ; but we think it does not include damages caused to him by the building of the road over the land of another.

If it be conceded that the legislature ought to have provided for the assessment of such damages, this undoubtedly presents a consideration to be weighed in determining the meaning of their language, but it does not absolutely necessitate the conclusion that they have made such provision. " It is only in case of some reasonable doubt of the meaning of the legislature, founded in the language of the act," that such a consideration can control the court in its construction. And the omission to provide for this case does not necessarily involve the imputation that the legislature deliberately intended to transcend their constitutional power. It is not altogether improbable that the con-

tingency that any damage might occur to a land-owner from the construction of the road over the land of another was not contemplated by the legislature. See KENT, Chan., in *Gardner* v. *Village of Newburgh*, 2 Johns. Ch. 162, p. 168. The early legislation on the subject of railroads was imperfect. See REDFIELD, C. J., in 25 Vermont, p. 58. Or if the contingency did occur to the legislature as possible, they might have supposed that it would result in only a few cases, and that it would be better, in those exceptional instances, to leave the corporation exposed to liability in a common law action, than to attempt the very difficult task of estimating such damages prior to the construction of the road. It is comparatively easy to estimate the prospective damages which will be occasioned to a lot of land by the building of a railroad over that lot. But it is quite a different matter to estimate the probable damage which will be caused to that lot by the construction of the road over numerous lots belonging to other persons, many of them situated at a considerable distance. The judgment of the appraisers on such a question would be extremely likely to be at fault. After a road is built, actual occurrences will afford more certain data for such an estimate. But the damages awarded under the statute are ordinarily to be assessed and paid before the making of the road. Comp. Stat., ch. 150, secs. 16 and 17. An estimate of such damages, made prior to the building of the road, but conclusive upon the parties for all coming time, would often fail to even approximate to correctness.

Decisions in other jurisdictions, upon the construction of statutes differing in phraseology from our own, are not in point. See *Indiana Central R. Co.* v. *Boden*, 10 Indiana 96 ; *Wabash & Erie Canal* v. *Spears*, 16 Indiana 441; DAVISON, J., in *Evansville & Crawfordsville R. R. Co.* v. *Dick*, 9 Indiana 433, p. 435 ; GREEN, C. J., in *Delaware & Raritan Canal Co.* v. *Lee*, 2 Zabriskie 243, p. 249 ; *Regina* v. *Eastern Counties Railway*, 2 Queen's Bench 347 ; *Dodge* v. *Com'rs*, 3 Metcalf 380 ; *Whitehouse* v. *Androscoggin R. R. Co.*, 52 Maine 208 ; *Parker* v. *B. & Me. R. R.*, 3 Cush. 107. If the construction of the statute in question has not already been settled adversely to the plaintiff by a decision in this State, the court are unanimously of opinion that the statute should be construed as not authorizing an appraisal of the damages covered by the ruling in this case, and that the appraisal consequently does not bar the action. I am not prepared to say that the decision in *Concord R. R.* v. *Greely*, 23 N. H. 237, is not an authority for the defendants on this point ; but no other member of the court is inclined to regard it in that light, and it is therefore unnecessary to consider whether, if it were held to be in point, the court ought to go to the length of overruling it. (As the decision in *Concord R. R.* v. *Greely* was not made until December, 1851, it seems that it could not have affected the appraisal in question.) It is satisfactory to know that our view that these damages were not included in the appraisal coincides with the contemporary understanding of the defendants. Of this, the language of the release affords conclusive evidence. It is obvious that the release does not include the damages in question ; and

it is equally obvious that the corporation could not have thought it worth while to take a release from the plaintiff which covered less than they understood to be included in the award.

The defendants' first position is, that the plaintiff has already received compensation for this damage. This position the court have now overruled. The defendants' next position is, that the plaintiff is not legally entitled to receive any compensation, but is bound to submit to the infliction of this damage without any right of redress. The argument is not put in the precise words we have just used, but that is what we understand them to mean. The defendants say that the legislative charter authorized them to build the road, if they did it in a prudent and careful manner; that they constructed the road at the cut with due care and prudence; and that they cannot be made liable as tort-feasors for doing what the legislature authorized them to do. This involves two propositions: first, that the legislature have attempted to authorize the defendants to inflict this injury upon the plaintiff without making compensation; and second, that the legislature have power to confer such authority. There are decisions which tend to show that the charter should not be construed as evincing any legislative intention to authorize this injury, or to shield the defendants from liability in a common law action. *Tinsman* v. *Belvidere Delaware R. R. Co.*, 2 Dutcher N. J. 148; *Sinnickson* v. *Johnson*, 2 Harr. N. J. 129; *Hooker* v. *New Haven & Northampton Co.*, 14 Conn. 146; *Fletcher* v. *Auburn & Syracuse R. R. Co.*, 25 Wendell 462; *Brown* v. *Cayuga & Susquehanna R. R. Co.*, 12 N. Y. (2 Kernan) 486, p. 491;—see, also, *Eastman* v. *Company*, 44 N. H. 143, p. 160; *Hooksett* v. *Company*, 44 N. H. 105, p. 110; *Company* v. *Goodale*, 46 N. H. 53, p. 57; BARROWS, J., in *Lee* v. *Pembroke Iron Co.*, 57 Maine 481, p. 488. But we propose to waive inquiry on this point, and to consider only the correctness of the second proposition, or, in other words, the question of legislative power.

The defendants cannot claim protection under an implied power, where an express power would be invalid: the legislature cannot do indirectly what they cannot do directly. Unless an express provision in the charter, authorizing the infliction of this injury without making compensation, would be a valid exercise of legislative power, the defendants cannot successfully set up the plea that the injury was necessarily consequent upon the exercise of their chartered powers, and therefore impliedly authorized. The defence, then, really presents this question: Have the legislature power to authorize the railroad corporation to divert the waters of the river, by removing a natural barrier, so as to cause the waters " sometimes in floods and freshets " to flow over the plaintiff's land, " carrying sand, gravel, and stones " upon his farm, without making any provision for his compensation?

Although the constitution of this State does not contain, in any one clause, an express provision requiring compensation to be made when private property is taken for public uses, yet it has been construed by

the courts, in view of the spirit and tenor of the whole instrument, as prohibiting such taking without compensation; and it is understood to be the settled law of the State, that the legislature cannot constitutionally authorize such a taking without compensation. *Piscataqua Bridge* v. *N. H. Bridge*, 7 N. H. 35, pp. 66, 70; PERLEY, C. J., in *Petition of Mount Washington Road Co.*, 35 N. H. 134, pp. 141, 142; SARGENT, J., in *Eastman* v. *Amoskeag Manuf. Co.*, 44 N. H. 143, p. 160; *State* v. *Franklin Falls Co.*, 49 N. H. 240, p. 251. The counsel for the defendants have not been understood to question the correctness of this interpretation of the constitution.

The vital issue then is, whether the injuries complained of amount to a taking of the plaintiff's property, within the constitutional meaning of those terms. It might seem that to state such a question is to answer it; but an examination of the authorities reveals a decided conflict of opinion. The constitutional prohibition (which exists in most, or all of the States) has received, in some quarters, a construction which renders it of comparatively little worth, being interpreted much as if it read,—"No person shall be divested of the formal title to property without compensation, but he may, without compensation, be deprived of all that makes the title valuable." To constitue a "taking of property," it seems to have sometimes been held necessary that there should be "an exclusive appropriation," "a total assumption of possession," "a complete ouster," an absolute or total conversion of the entire property, "a taking the property altogether." These views seem to us to be founded on a misconception of the meaning of the term "property," as used in the various State constitutions.

In a strict legal sense, land is not "property," but the subject of property. The term "property," although in common parlance frequently applied to a tract of land or a chattel, in its legal signification "means only the rights of the owner in relation to it." "It denotes a right * * * * * over a determinate thing." ("Property is the right of any person to possess, use, enjoy, and dispose of a thing." SELDON, J., in *Wynehamer* v. *The People*, 13 N. Y. 378, p. 433; 1 Blackstone Com. 138; 2 Austin on Jurisprudence, 3d ed., 817, 818. If property in land consists in certain essential rights, and a physical interference with the land substantially subverts one of those rights, such interference "takes," *pro tanto*, the owner's "property." The right of indefinite user (or of using indefinitely) is an essential quality or attribute of absolute property, without which absolute property can have no legal existence. ("Use is the real side of property.") This right of user necessarily includes the right and power of excluding others from using the land. See 2 Austin on Jurisprudence, 3d ed., 836; WELLS, J., in *Walker* v. *O. C. W. R. R.*, 103 Mass. 10, p. 14. From the very nature of these rights of user and of exclusion, it is evident that they cannot be materially abridged without, *ipso facto*, taking the owner's "property." If the right of indefinite user is an essential element of absolute property

or complete ownership, whatever physical interference annuls this right takes "property,"—although the owner may still have left to him valuable rights (in the article) of a more limited and circumscribed nature. He has not the same property that he formerly had. Then, he had an unlimited right; now, he has only a limited right. His absolute ownership has been reduced to a qualified ownership. Restricting A's unlimited right of using one hundred acres of land to a limited right of using the same land, may work a far greater injury to A than to take from him the title in fee simple to one acre, leaving him the unrestricted right of using the remaining ninety-nine acres. Nobody doubts that the latter transaction would constitute a "taking of property." Why not the former?

If, on the other hand, the land itself be regarded as "property," the practical result is the same. The purpose of this constitutional prohibition cannot be ignored in its interpretation. The framers of the constitution intended to protect rights which are worth protecting; not mere empty titles, or barren insignia of ownership, which are of no substantial value. If the land, "in its corporeal substance and entity," is "property," still, all that makes this property of any value is the aggregation of rights or qualities which the law annexes as incidents to the ownership of it. The constitutional prohibition must have been intended to protect all the essential elements of ownership which make "property" valuable. Among these elements is, fundamentally, the right of user, including, of course, the corresponding right of excluding others from the use. See Comstock, J., in *Wynehamer* v. *The People,* 13 N. Y. 378, p. 396. A physical interference with the land, which substantially abridges this right, takes the owner's "property" to just so great an extent as he is thereby deprived of this right. "To deprive one of the use of his land is depriving him of his land;" for, as Lord Coke said,—"What is the land but the profits thereof?" Sutherland, J., in *People* v. *Kerr,* 37 Barb. 357, p. 399; Co. Litt., 4 *b.* The private injury is thereby as completely effected as if the land itself were "physically taken away."

The principle must be the same whether the owner is wholly deprived of the use of his land, or only partially deprived of it; although the amount or value of the property taken in the two instances may widely differ. If the railroad corporation take a strip four rods wide out of a farm to build their track upon, they cannot escape paying for the strip by the plea that they have not taken the whole farm. So a partial, but substantial, restriction of the right of user may not annihilate all the owner's rights of property in the land, but it is none the less true that a part of his property is taken. ( Taking a part "is as much forbidden by the constitution as taking the whole.) The difference is only one of degree; the quantum of interest may vary, but the principle is the same." See 6 Am. Law Review 197–198; Lawrence, J., in *Nevins* v. *City of Peoria,* 41 Illinois 502, p. 511. The explicit language used in one clause of our constitution indicates the spirit of the whole instrument. "No part of a man's property shall be taken * * * *

* *." Constitution of N. H., Bill of Rights, article 12. The opposite construction would practically nullify the constitution. (If the public can take part of a man's property without compensation, they can, by successive takings of the different parts, soon acquire the whole. Or, if it is held that the complete divestiture of the last scintilla of interest is a taking of the whole for which compensation must be made, it will be easy to leave the owner an interest in the land of infinitesimal value.)

The injury complained of in this case is not a mere personal inconvenience or annoyance to the occupant. Two marked characteristics distinguish this injury from that described in many other cases. First, it is a physical injury to the land itself, a physical interference with the rights of property, an actual disturbance of the plaintiff's possession. Second, it would clearly be actionable if done by a private person without legislative authority. The damage is " consequential," in the sense of not following immediately in point of time upon the act of cutting through the ridge, but it is what Sir WILLIAM ERLE calls " consequential damage to the actionable degree." See Brand v. H. & C. R. Co., Law Reports, 2 Queen's Bench 223, p. 249. These occasional inundations may produce the same effect in preventing the plaintiff from making a beneficial use of the land as would be caused by a manual asportation of the constituent materials of the soil. Covering the land with water, or with stones, is a serious interruption of the plaintiff's right to use it in the ordinary manner. If it be said that the plaintiff still has his land, it may be answered, that the face of the land does not remain unchanged, and that the injury may result in taking away part of the soil (" and, if this may be done, the plaintiff's dwelling-house may soon follow ") ; and that, even if the soil remains, the plaintiff may, by these occasional submergings, be deprived of the profits which would otherwise grow out of his tenure. " His dominion over it, his power of choice as to the uses to which he will devote it, are materially limited." BRINKERHOFF, J., in Reeves v. Treasurer of Wood County, 8 Ohio St. 333, p. 346.

The nature of the injury done to the plaintiff may also be seen by adverting to the nature of the right claimed by the defendants. The primary purpose of the defendants in cutting through the ridge was to construct their road at a lower level than would otherwise have been practicable. But, although the cut was not made " for the purpose of conducting the water in a given course" on to the plaintiff's land, it has that result; and the defendants persist in allowing this excavation to remain, notwithstanding the injury thereby visibly caused to the plaintiff. Rather than raise the grade of their track, they insist upon keeping open a canal to conduct the flood waters of the river directly on to the plaintiff's land. If it be said that the water came naturally from the southerly end of the cut on to the plaintiff's land, the answer is, that the water did not come naturally to the southerly end of the cut. It came there by reason of the defendants' having made that cut. In consequence of the cut, water collected at the southerly boundary of the ridge, north of the plaintiff's farm, which would not have been

there if the ridge had remained in its normal and unbroken condition. They have " so dealt with the soil " of the ridge, that, if a flood came, instead of being held in check by the ridge, and ultimately getting away by the proper river channel without harm to the plaintiff, it flowed through where the ridge once was on to the plaintiff's land. " Could the defendants say they were not liable because they did not cause the rain to fall," which resulted in the freshet; or because the water " came there by the attraction of gravitation ?" See BRAMWELL, Baron, in *Smith* v. *Fletcher*, Law Reports, 7 Exchq. 305, p. 310. If the ridge still remained in its natural condition, could the defendants pump up the flood water into a spout on the top of the ridge, and thence, by means of the spout, pour it directly on to the plaintiff's land ? If not, how can they maintain a canal through which the water by the force of gravitation will inevitably find its way to the plaintiff's land ? See AMES, J., in *Shipley* v. *Fifty Associates*, 106 Mass. 194, pp. 199, 200 ; CHAPMAN, C. J., in *Salisbury* v. *Herchenroder*, 106 Mass. 458, p. 460. To turn a stream of water on to the plaintiff's premises is as marked an infringement of his proprietary rights as it would be for the defendants to go upon the premises in person and " dig a ditch, or deposit upon them a mound of earth." See LAWRENCE, J., in *Nevins* v. *City of Peoria*, 41 Illinois 502, p. 510 ; DIXON, C. J., in *Pettigrew* v. *Village of Evansville*, 25 Wisconsin 223, pp. 231, 236. The defendants may, perhaps, regret that they cannot maintain their track at its present level without thereby occasionally pouring flood water on to the land of the plaintiff. Indeed, the passage of this water through the cut may cause some injury to the defendants' road bed. But the advantages of maintaining the track at the present grade outweigh, in the defendants' estimation, the risk of injury by water to themselves and to the plaintiff. In asserting the right to maintain the present condition of things as to the cut, the defendants necessarily assert the right to produce all the results which naturally follow from the existence of the cut. In effect, they thus assert a right to discharge water on to the plaintiff's land. Such a right is an easement. A right of " occasional flooding " is just as much an easement as a right of " permanent submerging ;" it belongs to the class of easements which " are by their nature intermittent—that is, usable or used only at times." See Goddard's Law of Easements 125. If the defendants had erected a dam on their own land across the river below the plaintiff's meadow, and by means of flashboards thereon had occasionally caused the water to flow back and overflow the plaintiff's meadow so long and under such circumstances as to give them a prescriptive right to continue such flowage, the right thus acquired would unquestionably be an " easement." The right acquired in that case does not differ in its nature from the right now claimed. In the former instance, the defendants flow the plaintiff's land by erecting an unnatural barrier below his premises. In the present instance, they flow his land by removing a natural barrier on the land above his premises. In both instances, they flow his land by making " a non-natural use "

of their own land. In both instances, they do an act upon their own land, the effect of which is to restrict or burden the plaintiff's ownership of his land (see *Leconfield* v. *Lonsdale*, Law Reports, 5 Com. Pleas. 657, p. 696) ; and the weight of that burden is not necessarily dependent upon the source of the water, whether from below or above. See BELL, J., in *Tillotson* v. *Smith*, 32 N. H. 90, pp. 95–96. In both instances they turn water upon the plaintiff's land " which does not flow naturally in that place." If the right acquired in the former instance is an easement, equally so must be the right claimed in the latter. If, then, the claim set up by the defendants in this case is well founded, an easement is already vested in them. An easement is property, and is within the protection of the constitutional prohibition now under consideration. If the defendants have acquired this easement, it cannot be taken from them, even for the public use, without compensation. But the right acquired by the defendants is subtracted from the plaintiff's ownership of the land. Whatever interest the defendants have acquired in this respect the plaintiff has lost. If what they have gained is property, then what he has lost is property. If the easement, when once acquired, cannot be taken from the defendants without compensation, can the defendants take it from the plaintiff in the first instance without compensation? See BRINKERHOFF, J., *ubi sup.* ; SELDEN, J., in *Williams* v. *N. Y. Central R. R.*, 16 N. Y. 97, p. 109. An easement is all that the railroad corporation acquire when they locate and construct their track directly over a man's land. The fee remains in the original owner. *Blake* v. *Rich*, 34 N. H. 282. Yet nobody doubts that such location and construction is a " taking of property," for which compensation must be made. See REDFIELD, J., in *Hatch* v. *Vt. Central R. R.*, 25 Vt. 49, p. 66. What difference does it make in principle whether the plaintiff's land is incumbered with stones, or with iron rails ? whether the defendants run a locomotive over it, or flood it with the waters of Baker's river ? See WILCOX, J., in *March* v. *P. & C. R. R.*, 19 N. H. 372, p. 380 ; WALWORTH, Chan., in *Canal Com'rs & Canal Appraisers* v. *The People*, 5 Wendell 423, p. 452.

If it should be held that the legislature had conferred a valid authority upon the defendants to make this cut, if necessary to the construction of the railroad, or if made with care and skill, the question of necessity or of care would become material, and might have to be decided by a jury. (See *Johnson* v. *Atlantic & St. L. R. Co.*, 35 N. H. 569 ; *Estabrooks* v. *P. & S. R. Co.*, 12 Cush. 224 ; *Mellen* v. *Western R. R.*, 4 Gray 301 ; *Curtis* v. *Eastern R. R.*, 14 Allen 55 ; same case, 98 Mass. 428.) But in the view now taken, these questions are immaterial. The defendants are not held liable, as in some other cases, because their acts were unnecessary, or unskilful, and hence not within the contemplation of the charter. They are held liable, irrespective of any negligence on their part, on the ground that it was beyond the power of the legislature to authorize the infliction of this injury on the plaintiff, without making provision for his compensation.

We think that here has been a taking of the plaintiff's property; that, as the statutes under which the defendants acted make no provision for the plaintiff's compensation, they afford no justification; that the defendants are liable in this action as wrong-doers; and that the ruling of the court was correct. These conclusions, which are supported by authorities to which reference will soon be made, seem to us so clear, that, if there were no adverse authorities, it would be unnecessary to prolong the discussion of this case. But, as there are respectable authorities which are in direct conflict with these conclusions, it has been thought desirable to examine some arguments which have, at various times, been advanced in support of the opposite view.

In some instances, as soon as it has been made to appear that there is a legislative enactment purporting to authorize the doing of the act complained of, the complaint has been at once summarily disposed of by the curt statement " that an act authorized by law cannot be a tort." This is begging the question." It assumes the constitutionality of the statute. If the enactment is opposed to the constitution, it is " in fact no law at all." " The term *unconstitutional law*, in American jurisprudence, is a misnomer, and implies a contradiction." " The will of the legislature is only law when it is in harmony with, or at least is not opposed to, that controlling instrument which governs the legislative body equally with the private citizen." Cooley's Constitutional Limitations, 1st ed., pp. 3, 4. The error in question originates in a " fallacy of reference." It arises from following English authorities, without adverting to the immense difference between the practically omnipotent powers of the British parliament and the comparatively limited powers of our State legislatures, acting under the restrictions of written constitutions. Parliament is the supreme power of the realm. It is at once a legislature and a constitutional convention. 1 De Tocqueville's Democracy in America, Reeves's Translation, 2d Am. ed., 80. Parliament can " do everything that is not naturally impossible;" and what it does "no authority on earth can undo." 1 Blackstone's Com. 161; 4 Coke's Inst. 36. A State legislature, on the other hand, " is powerless when it attempts to pass the limits prescribed by the constitution." See Cooley's Const. Lim., 1st ed., 45, 46. In England, whenever it appears that the act complained of was authorized by a parliamentary statute, the court are perfectly justified in dismissing the complaint, on the ground that the act was " authorized by law." In this country, when it appears that the legislature have gone through the form of enacting a statute purporting to authorize the act complained of, the further inquiry remains, whether the legislature had the constitutional power to pass such a statute. If they had not, then their enactment is not " law," and can afford no justification. The error of blindly following English authorities, as to the justification afforded by statutory enactments, has repeatedly been exposed. SWAN, J., in *Crawford* v. *The Village of Delaware*, 7 Ohio St. 459, pp. 466, 477; MAISON, Senator, in *Bloodgood* v. *Mohawk & Hudson Railroad Co.*, 18 Wendell 9, pp. 29–31; ARCHER, C. J., in *Barron* v.

*Mayor of Baltimore,* 2 Amer. Jurist 210; Smith, J., in *Goodall* v. *City of Milwaukee,* 5 Wisconsin 32, pp. 38, 45 ; Cooley's Const. Lim., 1st ed., 85 ;—and see, also, Angell on Watercourses, 6th ed., sec. 461 ; Sutherland, J., in *People* v. *Kerr,* 37 Barb. 357, pp. 412, 415 ; 1 Redf. on Railways, 4th ed., 232.

The error in the argument just commented upon may, perhaps, be summed up in the statement, that it confounds the legislature with the constitutional convention. Closely allied to this is the error of confounding the legislature with the supreme court. It seems to have been contended that the legislature is competent to determine whether a franchise will be injurious to other interests, and that it is to be presumed, after a legislative grant, "that there is no just claim for resulting damages which has not been provided for." See American Law Magazine, vol. 1, No. 1, April, 1843, 58–60. This assumes both the omniscience and omnipotence of the legislature. If the legislators themselves are to finally decide whether they have transcended their constitutional powers, "then," in the words of Daniel Webster, "the constitution ceases to be a legal and becomes only a moral restraint upon the legislature." It "is admonitory or advisory only, not legally binding * * *." Speech on The Independence of the Judiciary, quoted in Cooley's Const. Lim., 1st ed. 46, note 1. It is now universally conceded to be the province and duty of the judiciary to pass upon the constitutionality of statutes ; but it is to be regretted that some courts have manifested excessive reluctance to pronounce statutes unconstitutional. "Whatever respect may be due to the legislature, that due to the constitution is still greater ; " Lawrence, J., in *Bunn* v. *The People,* 45 Illinois 397, p. 419. The result has sometimes been "to sacrifice the individual to the community." See Sedgwick on Damages, 5th ed., 121, 122. "It is not," said Mr. Sedgwick, "an agreeable observation to make, but I believe it cannot be denied, that the protection afforded by the English government to property is much more complete in this respect than under our system, although Parliament claims to be despotically supreme, and although we boast our submission to constitutional restrictions * * *." Sedgwick on Stat. and Const. Law 523, 524, note. Parliamentary acts, at the present time, usually contain carefully drawn clauses, scrupulously providing for the indemnity of those who are liable to be injured by the exercise of the powers granted by the act. In this country it too often happens that the legislature neglect to carefully perform this duty, and the failure of the courts to pronounce the act unconstitutional leaves the injured party without remedy. In view of the "form that the constitutional provision has assumed " in the hands of some courts, "it must," said the same author, "be admitted that in practice our constitutional guarantees are very flexible things * * *." Sedgwick on Stat. and Const. Law 534.

It is said that "if the legislature is competent to furnish the remedy, there is no denial of justice, though no action can be sustained at law." 1 Amer. Law Magazine, April, 1843, 57. Leave to apply to a future

legislature for an act of indemnity is not the " certain remedy " to which (by article 14 of the Bill of Rights) every subject is entitled " for all injuries he may receive  *  *  *  in his property." Besides, " is the obligation to make him compensation any stronger upon a future legislature than it was on that one by whose authority his property has been taken ; " and if they have " failed to make a constitutional provision for his compensation," " what assurance can he have " that any future legislature will do. so ? " It was, however, to place the rights of property upon higher grounds than the mere legislative sense of justice and equity, that this prohibition upon legislative power was embodied in the bill of rights. " MOORE, J., in *Buffalo B. B. & C. R. R. Co.* v. *Ferris,* 26 Texas 588, p. 602.

It has been contended that in order to establish the position " that the right of action in behalf of the party injured " is " the same as if no charter existed," " it is necessary to show that the grant " of the franchise " is absolutely void." 1 Amer. Law Magazine 64. It is undoubtedly necessary to show that the charter is void, in so far as it purports to authorize the infliction of the injury in question ; but not that it is void in all other respects, conferring no valid rights as against any person whatever. If the legislature grant a charter purporting to authorize the grantee to take the property of A for public use upon making compensation, and the property of B without making compensation, the charter is invalid as against B, but may confer a right as against A. It is familiar law that " where an agent exceeds his authority, what he does within it is valid, if that part be distinctly severable from the remainder." 1 Parsons on Contracts, 4th ed., 58. The same principle applies to the exercise by the legislature of the power delegated to them by the constitution. No sound argument can be founded upon the hardship to the grantees of not receiving all that the legislature undertook to convey to them. Conceding that the grantees, by assuming the performance of the duties required of them by the charter, have paid a full consideration for all the privileges which the charter purported to convey to them, how does their case differ from that of other unfortunate persons who have purchased property of an irresponsible party who had no right to sell ? Is the fact that the purchaser paid a full consideration to the wrongful vendor allowed to divest the title of the true owner? Yet, upon what other theory can it be said (1 Amer. Law Magazine 75) that " we cannot look beyond the charter itself to determine the duties and liabilities of the grantee ?"

The consideration is sometimes urged, that the building of a railroad is a work of great public convenience and benefit. This may afford an excellent reason for taking the plaintiff's land in the constitutional manner, but not for taking it without compensation. If the work is one of great public benefit, " the public can afford to pay for it." GREEN, Chan., in *Hinchman* v. *Paterson Horse R. R. Co.,* 2 C. E. Green (N. J.) 75, p. 80 ; PARKER, C. J., in *Piscataqua Bridge* v. *N. H. Bridge,* 7 N. H. 35, p. 64. " Either, therefore, the railway

ought not ⌐    ⌐ made, or the damage may well be paid for."
BRAMWELL, Baron, in *Brand* v. *H. & C. Railway Co.*, Law Reports, 2
Queen's Bench 223, p. 231.  "In the case at bar, the plaintiff is ex-
pected to give his land  *  *  *  *  *.  Why is he called upon
rather than another?"  COLE, J., in *Cash* v. *Whitworth*, 13 Louisiana
Annual 401, p. 403.  "Taxation exacts money from individuals as
their share of a justly imposed and apportioned public burthen,
and the equivalent is presumptively received in the benefits con-
ferred by the government.  Property taken for public use from one
or more individuals only, by right of eminent domain, is taken not as
his or their share of an apportioned public burthen, but as something
distinct from and more than his or their share of the public burthens,
and therefore the justice and necessity of a constitutional provision
for compensation."  BUTLER, J., in *Booth* v. *Town of Woodbury*, 32
Conn. 130; RUGGLES, J., in *People* v. *Mayor of Brooklyn*, 4
Comstock 419, p. 424.  In *Street Railway* v. *Cumminsville*, 14 Ohio
St. 523, it was found as a fact, that, taking into consideration the
interests of the company and the general travelling public, as well as
those of the lot-owners, the location was " as little injurious as it would
be in any other part of the highway."  " This," said RANNEY, J., p.
550, " is the common case, where private property is taken for public
uses.  Reduced into plain English, it simply amounts to this, that the
company and the public will gain as much as the lot-owners lose.  The
difficulty of giving this any effect in the present case arises from the
fact that the justice of the constitution has provided that what the
one thus gains and the other loses shall be paid for, before the prop-
erty is taken or invaded."  " If," said WILLIAMS, J. (in 3 Bush. Ken-
tucky 429, 430), " the improvement is of great public utility, it
will not be an onerous burden for the public to pay the damage; if
so, it would, of course, be a much greater and peculiar burden and
hardship on these individual proprietors.  If the damages are great,
they should not be imposed to the destruction of the individual pro-
prietors.  If they are not great, the burden on the public will be
light.  If too heavy to be imposed on the public, this should admon-
ish the authorities not to impose them on the individual proprietors."
WILLIAMS, J., in *Louisville* v. *Rolling Mill Co.*, 3 Bush. (Kentucky)
416, pp. 429, 430 ; and see WILLIAMS, C. J., in *Enfield Toll Bridge Co.*
v. *Hartf. & N. H. R. R. Co.*, 17 Conn. 40, pp. 58, 59.

It is said that a land-owner is not entitled to compensation where
the damage is merely " consequential."  The use of this term " conse-
quential damage " " prolongs the dispute," and " introduces an equivo-
cation which is fatal to any hope of a clear settlement."  It means
both damage which is so remote as not to be actionable, and damage
which is actionable.  Sometimes it is used to denote damage which,
though actionable, does not follow immediately, in point of time, upon
the doing of the act complained of; what ERLE, C. J., aptly terms
" consequential damage to the actionable degree."  *Brand* v. *H. & C.
R. Co.*, Law Reports, 2 Queen's Bench 223, p. 249.  It is thus used to

signify damage which is recoverable at common law in an action of case, as contradistinguished from an action of trespass. On the other hand, it is used to denote a damage which is so remote a consequence of an act that the law affords no remedy to recover it. The terms "remote damages" and "consequential damages" "are not necessarily synonymous, or to be indifferently used. All remote damages are consequential, but all consequential damages are by no means remote." Sedgwick on Damages, 5th ed., 56. When, then, it is said that a land-owner is not entitled to compensation for "consequential damage," it is impossible either to affirm or deny the correctness of the statement until we know in what sense the phrase "consequential damage" is used. If it is to be taken to mean damage which would not have been actionable at common law if done by a private individual, the proposition is correct. The constitutional restriction was designed "not to give new rights, but to protect those already existing." Pierce on Am. R. R. Law 173; (and see *Rickett* v. *Directors, &c., of Metropolitan Railway Co.*, Law Reports, 2 House of Lords 175, pp. 188, 189, 196). But this does not concern the present case, where it is virtually conceded that the injury would have been actionable if done by a private individual not acting under statutory authority. If, upon the other hand, the phrase is used to describe damage, which, though not following immediately in point of time upon the doing of the act complained of, is nevertherless actionable, there seems no good reason for establishing an arbitrary rule that such damage can in no event amount to a "taking of property."

The severity of the injury ultimately resulting from an act is not always in inverse proportion to the lapse of time between the doing of the act and the production of the result. Heavy damages are recovered in case as well as in trespass. The question whether the injury constitutes a "taking of property" must depend on its effect upon proprietary rights, not on the length of time necessary to produce that effect. If a man's entire farm is permanently submerged, is the damage to him any less because the submerging was only the "consequential" result of another's act? It has been said "that a nuisance by flooding a man's land was originally considered so far a species of ouster, that he might have had a remedy for it by assize of novel disseizin;" but if it be conceded that at present the only common law remedy is by an action on the case, that does not change the aspect of the constitutional question. The form of action in which the remedy must be sought cannot be decisive of the question whether the injury falls within the constitutional prohibition. "We are not to suppose that the framers of the constitution meant to entangle their meaning in the mazes" of the refined technical distinctions by which the common law system of forms of action is "perplexed and incumbered." Such a test would be inapplicable in a large proportion of the States, where the distinction between trespass and case has been annihilated by the abolition of the old forms of action. We are not alone in the opinion that the phrase "consequential damage" has been misapplied

in some of the discussions on this constitutional question;—see the criticisms of MILLER, J., in *Pumpelly* v. *Green Bay Company*, 13 Wallace U. S. 166, p. 180 ; PAINE, J., in *Alexander* v. *City of Milwaukee*, 16 Wisconsin 247, p. 258; SUTHERLAND, J., in *People* v. *Kerr*, 37 Barb. 357, pp. 403, 408 ;—and we think that the confusion thus engendered will account for some erroneous decisions. If this most ambiguous expression is to be used at all in this connection, the meaning attached to it should always be clearly defined, as is done in Pierce on Am. Railroad Law 173.

It may perhaps be urged that a decision in favor of the plaintiff will give rise to a multiplicity of suits by other claimants, many of whom have sustained no substantial damage. But this affords no ground for denying redress to this plaintiff, who has clearly sustained a substantial injury. Nor will the present decision be a precedent in future cases differing in their nature from the one before us. The answers given by other courts to similar objections are quite decisive. Ld. DENMAN, C. J., in *Regina* v. *Eastern Counties Railway Co.*, 2 Queen's Bench 347, pp. 362, 363 ; MONTAGUE SMITH, J., in *Brand* v. *H. & C. Railway Co.*, Law Reports, 2 Queen's Bench 223, p. 245 ; PARKER, C. J., in *Boston & Roxbury Mill Corp.* v. *Gardner*, 2 Pick. 33, pp. 38, 39.

Our conclusion, that the second ground of defence set up in this case must be overruled, is supported by *Pumpelly* v. *Green Bay Co.*, 13 Wallace U. S. 166 ; *Evansville & Crawfordsville R. R. Co.* v. *Dick*, 9 Ind. 433 ; and by that part of the decision in *Richardson* v. *Vt. Central R. R. Co.*, 25 Vt. 465, which holds the plaintiff entitled to recover for damage occasioned by his land's falling into the cut ;—see, also, *Hay* v. *Cohoes Co.*, 2 Comstock N. Y. 159 ; RANNEY, J., in *Carman* v. *Steubenville & Indiana R. R. Co.*, 4 Ohio St. 399, p. 413. In *Hooker* v. *The New Haven & North Hampton Co.*, 14 Conn. 146, S. C. 15 Conn. 312, it was held that no intent of the legislature to authorize the injury was apparent; but some of the reasoning of WILLIAMS, C. J., tends very strongly to show that an attempt to confer such authority would have been unavailing. See 14 Conn. 151–162 ; 15 Conn. 317, 319, 321, 325.

There are also numerous cases in which the decisions, or *dicta*, tend to sustain the principle of the present decision. *People* v. *Nearing*, 27 N. Y. 306, pp. 308, 310 ; BRINKERHOFF, J., in *Reeves* v. *Treasurer of Wood County*, 8 Ohio St. 333, p. 346 (and see in this connection *Tide Water Co.* v. *Coster*, 3 C. E. Green N. J. 158, S. C. 3 C. E. Green 54) ; *In the matter of Bushwick Avenue*, 48 Barb. 9, J. F. BARNARD, J., p. 12 ; MULLIN, P. J., in *Village of Lancaster* v. *Richardson*, 4 Lansing 136, p. 141 ; *Lee* v. *Pembroke Iron Co.*, 57 Me. 481, BARROWS, J., p. 488 ; BIGELOW, J., in *Brigham* v. *Edmands*, 7 Gray 359, p. 363 ; ZABRISKIE, Chan., in *Jersey City & Bergen R. R. Co.* v. *Jersey City & Hoboken Horse R. R. Co.*, 20 N. J. Ch. (5 C. E. Green) 61, p. 62 ; *Gardner* v. *Village of Newburgh*, 2 Johns. Ch. 162 ; BECK, J., in *McCord* v. *High*, 24 Iowa 336, p. 342 ; *Woodruff* v. *Neal*, 28 Conn. 165 ; VALENTINE, J.,

in *U. P. R. W. Co. E. D.* v. *Rollins*, 5 Kansas 167, pp. 176, 177, and in *Caulkins* v. *Mathews*, 5 Kansas 191, p. 200 ; *People* v. *Platt*, 17 Johns. 195 ; *State* v. *Glen*, and *Cornelius* v. *Glen*, 7 Jones's Law (N. C.) 321, 512 ; *Crenshaw* v. *Slate River Co.*, 6 Randolph (Va.) 245 ; *State* v. *Franklin Falls Co.*, 49 N. H. 240, p. 251 ; *State* v. *Laverack*, 34 N. J. Law (5 Vroom) 201 ; *Martin, ex parte,* 8 English (Ark.) 198 ; *Attorney General* v. *Germantown, &c., Turnpike Road,* 55 Penn. St. 466 ; *Glover* v. *Powell,* 2 Stockton Ch. (N. J.) 211 ; HOAR, J., in *Morse* v. *Stocker,* 1 Allen 150, pp. 157, 158 ; *Moale* v. *Mayor of Baltimore,* 5 Md. 314, LE GRAND, C. J., pp. 321, 322 ;—see, also, J. C. SMITH, J., in *Morgan* v. *King,* 35 N. Y. 454, p. 457 ; WALWORTH, Chan., in *Canal Com'rs & Canal Appraisers* v. *The People,* 5 Wendell 423, p. 448 ; *Barclay R. R. & Coal Co.* v. *Ingham,* 36 Penn. St. 194 ; BIRCHARD, C. J., in *Walker and Fulton* v. *Board of Public Works,* 16 Ohio 540, pp. 544, 545 ; ELLIOTT, J., in *City of Columbus* v. *Hydraulic W. M. Co.,* 33 Ind. 435, pp. 438, 439 ; *Murray* v. *Sharp,* 1 Bos. 539 ; *Yates* v. *Milwaukee,* 10 Wallace 497 ; E. DARWIN SMITH, J., in *Robinson* v. *N. Y. & Erie R. R.,* 27 Barb. 512, p. 522. Reference may also be made to " the weight of judicial authority " " against the power of the legislature to appropriate a common highway to the purposes of a railroad, unless at the same time provision is made for compensation to the owners of the fee." Cooley's Const. Lim., 1st ed., 545–547.

This conclusion is also supported by the definitions given by various judges and text-writers to the phrase " a taking of property." See, in addition to the foregoing citations, Angell on Watercourses, 6th ed., sec. 465 *a ;* Cooley's Const. Lim., 1st ed., 544 ; WILDE, J., in *Austin* v. *Murray,* 16 Pick. 121, p. 126 ; PUTNAM, J., in *Boston & Roxbury Mill Corp.* v. *Newman,* 12 Pick. 467, p. 482 ; NEVIUS, J., in *Ten Eyck* v. *The Delaware & Raritan Canal Co.,* 3 Harrison N. J. 200, p. 205 ; *Ex parte Jennings,* 6 Cowen 518, pp. 525, 526 ; WALWORTH, Chan., and ALLEN, Senator, in *Canal Com'rs & Appraisers* v. *The People, ex rel. Tibbits,* 5 Wendell 423, pp. 452, 456 ; SUTHERLAND, J., in S. C., 13 Wendell 355, pp. 372, 373 ; WALWORTH, Chan., in S. C., 17 Wend. 571, p. 605 ; MAISON, Senator, in *Bloodgood* v. *Mohawk & Hudson R. R. Co.,* 18 Wendell 9, pp. 34, 35 ; LEONARD, J., in *Walther* v. *Warner,* 25 Mo. 277, p. 289 ; LAWRENCE, J., in *Nevins* v. *City of Peoria,* 41 Illinois 502, pp. 509, 511 ; ARCHER, C. J., in *Barron* v. *Mayor of Baltimore,* 2 Am. Jurist 211, 212 (since overruled—see S. C., 7 Peters U. S. 243, p. 244) ; SMITH, J., in *Goodall* v. *Milwaukee,* 5 Wis. 32, pp. 39, 45, 46 ; SELDEN, J., in *Williams* v. *N. Y. Central R. R.,* 16 N. Y. 97, pp. 100, 110 ; PERKINS, J., in *Wabash & Erie Canal* v. *Spears,* 16 Ind. 441, p. 443.

It seems to have been sometimes supposed that the decisions opposed to these views are so numerous, that to differ from them might " almost wear the aspect of presumption." Such appears to have been the opinion of Mr. Sedgwick, who evidently differed, as to the intrinsic merits of the question, from the supposed weight of authority. Sedgwick on Stat. and Const. Law, 1st ed., 525, 533, 534. There are, undoubt-

edly, authorities which are in direct conflict with the present opinion. See, for instance, the decisions in *Bellinger* v. *N. Y. Central R. R.*, 23 N. Y. 42 ; *West Branch & Susquehanna Canal Co.* v. *Mulliner*, 68 Penn. St. 357 ; and the *dicta* of GILBERT, J., in *Arnold* v. *Hudson River R. R. Co.*, 49 Barb. 108, p. 121 (a case in which the result reached may, perhaps, stand well enough on the finding of fact, that the testator accepted the substituted structure as a compensation from the defendants for all damages sustained by him in consequence of their acts). (See, also, the remark of GIBSON, C. J., that the constitutional prohibition " extends not to the case of property injured or destroyed." *O' Connor* v. *Pittsburgh*, 18 Penn. St. 187, p. 190.) But the number of decisions, necessarily inconsistent with the present conclusions, is much smaller than has sometimes been supposed. If we look " to what has been actually *decided* " in many of the cases rather than " to what has been *said*," it will be found that the present reasoning would not necessarily have led to a different result.

There are classes or groups of authorities which, upon a superficial examination, might be supposed irreconcilable with our conclusions, but which, in fact, are not in point.

Thus, a petitioner for assessment of damages under a statute may fail to recover damages similar to those claimed here, because the statute did not provide for such a case ; but it does not follow that he cannot maintain a common law action. See *Indiana Central R. Co.* v. *Boden*, 10 Ind. 96 ; *Proprietors of Locks & Canals* v. *Nashua & Lowell R. R. Co.*, 10 Cush. 385, p. 388 ; *Estabrooks* v. *P. & S. R. R. Co.*, 12 Cush. 224. A petitioner under a statute can get nothing more than the statute gives him. The construction and not the constitutionality of the statute is the point for decision. Nothing else was decided in reference to Bradley's damages in *Kennett's Petition*, 24 N. H. 139, p. 143. If the case at bar were a petition under the statute, we should hold, as already intimated, that Eaton could not, in that proceeding, recover the damages claimed in this action. On the other hand, a common law action may fail, because there is a remedy given by statute which is exclusive. *Henniker* v. *Contoocook Valley R. R.*, 29 N. H. 146 ; *Stevens* v. *Proprietors of Middlesex Canal*, 12 Mass. 466 ; SHAW, C. J., in *Dodge* v. *County Com'rs*, 3 Met. 380, pp. 381, 382. (In *Rowe* v. *Granite Bridge Corporation*, 21 Pick. 344, it seems to be assumed that there was a statutory remedy for the damage to real estate ; see pp. 345, 346, 348.) In Massachusetts the statute provides for an assessment of damages in some cases which are not held to be included in the New Hampshire statutes. Hence, in some instances, an action of tort which would be maintainable in this State might be defeated in Massachusetts, upon the ground that there was an exclusive remedy by petition under the statute. See *Babcock* v. *Western R. R.*, 9 Met. 553 ; *Mellen* v. *Western R. R.*, 4 Gray 301 ; *Estabrooks* v. *Peterborough & Shirley R. R.*, 12 Cush. 224 ; *Perry* v. *Worcester*, 6 Gray 544 ; *Curtis* v. *Eastern R. R. Co.*, 14 Allen 55 ; S. C., 98 Mass. 428.

So there are cases where the plaintiff fails, not because the act

complained of was legal, but because it was a public nuisance—a wrong " to be redressed by a public prosecution, not by recovering damages in a private action,"—the plaintiff's damage differing " in degree only, not in kind," from that sustained by the rest of the community. See, for examples, *Blood* v. *Nashua & Lowell R. R.*, 2 Gray 137, pp. 140, 141 ; also, SHAW, C. J., in *Boston & Worcester R. R.* v. *Old Colony R. R.*, 12 Cush. 605, p. 606 ; BENNETT, J., in *Hatch* v. *Vt. Central R. R.*, 28 Vt. 142, p. 147 ; SUTHERLAND, J., in *Lansing* v. *Smith*, 8 Cowen 146, pp. 151–168.

Again : there is a class of cases where the plaintiff has failed, not because the damage complained of did not amount to a " taking of property," but because it was held that in those instances the plaintiff had already been compensated for it,—the courts holding that the damage must, in contemplation of law, be regarded as having been included in the assessment under the statute, or in the purchase money paid to the plaintiff. Examples of this class of cases may be found in *Skinner* v. *Hartford Bridge Co.*, 29 Conn. 523 ; *Sabin* v. *Vt. Central R. R.*, 25 Vt. 363 ; *Norris* v. *Vt. Central R. R.*, 28 Vt. 99 ; *Steele* v. *Western Inland Lock Navigation Co.*, 2 Johns. 283 ; *Clark's Adm'x* v. *Hannibal & St. Joseph R. R.*, 36 Mo. 202 ; *Hortsman* v. *Covington & Lexington R. R. Co.*, 18 B. Monroe 218, p. 222 ; *Baltimore & Potomac R. R.* v. *Magruder*, 34 Md. 79. And see *Babcock* v. *Western R. R.*, 9 Met. 553, p. 556. It seems to us that the decision in *Boothby* v. *Androscoggin & Ken. R. R.*, 51 Maine 318, might well have been put upon this ground ;—see the clear statement of STITES, J., in the somewhat analogous use of *Hortsman* v. *Covington & Lexington R. R. Co.*, 18 B. Monroe 218, p. 222. The principle of these cases would be applicable here, if the damage complained of had been occasioned by the construction of the railroad over Eaton's land, instead of over the land of other persons.

There is another class of cases inguishable from the present by the fact that the complainant in th cases has been deprived only of the privilege which he had enjoye in common with the rest of the public, of using public property. No 'ivate or exclusive right is invaded. The act complained of is merely a egulation of a public right. Suppose that the State cause or authorize an obstruction to the navigation of a navigable river which belongs to the State, but do not thereby invade or flood the lands of the riparian owner. The diminished facilities for navigation may render the adjacent land less valuable ; but so may a lawful change in the mode of occupying an adjacent tract of land belonging to a private owner. The riparian owner's land remains intact. He is only " deprived of the use of what was never his own." See *Gould* v. *Hudson River R. R.*, 6 N. Y. (2 Selden) 522 ; S. C., 12 Barb. 616 ; BARROWS, J., in *Lee* v. *Pembroke Iron Co.*, 57 Maine 481, pp. 486–488 ; SHAW, C. J., in *Davidson* v. *Boston & Maine R. R.*, 3 Cush. 91, p. 106 ; STRONG, J., in *People* v. *Tibbetts*, 19 N. Y. 523, p. 528 ; FOLGER, J., in *Coster* v. *Mayor of Albany*, 43 N. Y. 399, p. 415 ; *Shrunk* v. *Pres., &c., of Schuylkill Nav. Co.*, 14 Serg. & Rawle 71 ;

*Zimmerman* v. *Union Canal Co.*, 1 W. & S. 346 ; *Com.* v. *Richter*, 1 Penn. R., by Rawle, Penrose & Watts, 462 ; *Monongahela Bridge Co.* v. *Kirk*, 46 Penn. St. 112 ; *Clarke* v. *Birmingham & Pittsburgh Bridge Co.*, 41 Penn. St. 147 ; *Spring* v. *Russell*, 7 Greenl. 273 (as explained in 57 Maine 486) ; 3 Edw. Ch. 290 ; and see *Com'rs of Homochitto River* v. *Withers*, 29 Miss. 21 ; *N. Y. & Erie R. R.* v. *Young*, 33 Penn. St. 175 ; *Susquehanna Canal Co.* v. *Wright*, 9 W. & S. 9 ; *McKeen* v. *Delaware Div. Canal Co.*, 49 Penn. St. 424. See, however, *Yates* v. *Milwaukee*, 10 Wallace U. S. 497. In the much considered case of *Canal Com'rs and Canal Appraisers* v. *The People, ex rel. Tibbits*, 17 Wend. 571, S. C., 13 Wend. 355, 5 Wend. 423, the majority of the court disallowed the relator's claim to compensation for the destruction of the waterfall in the Mohawk river, upon the ground that the bed of the Mohawk belonged to the State, and did not pass under the grant of the adjacent land. To the same effect is the decision in *People, ex rel. Loomis*, v. *Canal Appraisers*, 33 N. Y. 461. If any decisions or *dicta* go to the length of asserting that the State, under the guise of regulating or improving public property, may infringe on private rights without compensation (see GIBSON, C. J., in *Monongahela Nav. Co.* v. *Coons*, 6 W. & S. 101, pp. 113, 114 ; *Hollister* v. *Union Co.*, 9 Conn. 436), it is only necessary in this connection to point out that such a doctrine, even if correct, is inapplicable to the present case. The improvement of Baker's river " was not within the contemplation of the legislature " in granting the defendant's charter, " and no authority for that purpose was given." See GREEN, C. J., in *Tinsman* v. *Belvidere Delaware R. R. Co.*, 2 Dutcher N. J. 148, p. 175.

The case at bar is clearly distinguishable from the class of cases where an entry on land for a merely temporary purpose has been held not to be a " taking of property ; " as, for example, an entry to perambulate the boundaries of towns, or to make preliminary surveys with a view to determining the location of a proposed railroad (see 1 Redf. on R., 4th ed., 240, 241), or " the entry of an officer charged with the execution of criminal process upon the land of a third person for the purpose of making the arrest." In these instances there is only " a technical trespass," and the damage, in general, is merely nominal. The real estate is not " permanently subjected to a servitude." " The beneficial possession of the owner is not substantially interfered with." See *Winslow* v. *Gifford*, 6 Cush. 327 ; *Polly* v. *Sar. & Wash. R. R. Co.*, 9 Barb. 449 ; WALWORTH, Chan., in *Bloodgood* v. *Mohawk & Hudson R. R. Co.*, 18 Wend. 9, p. 17 ; BIGELOW, J., in *Brigham* v. *Edmands*, 7 Gray 359, p. 363 ; LEONARD, J., in *Walther* v. *Warner*, 25 Mo. 277, p. 289. This principle is utterly inapplicable here, where the right is claimed to impose a permanent servitude, and where, if the claim is well founded, the defendants will gain and the plaintiff will lose the title to an easement, thus seeming to bring the case within the definition in the *dicta* of SHEPLEY, C. J., in *Cushman* v. *Smith*, 34 Me. 247, pp. 258, 260. It was claimed in argument

by the plaintiff, and not controverted by the defendants, that the damages in the present cases are of a very substantial. character. If it is said that consistency requires a construction of the constitutional provision which would extend it to all invasions of real estate, however momentary, which would be actionable if committed by a private individual, it may be answered, that the same reason which induces us to deny that the constitutional restriction is confined to the taking of the formal title, also negatives the idea that it was intended to include injuries which are merely technical and nominal. The real substance of the injury, not its technical name in legal phraseology, is the criterion whereby to determine whether it falls within the constitutional restriction.

*Bassett* v. *Salisbury Manufacturing Company*, 47 N. H. 426, was an application to a court of equity for an injunction to restrain the defendants from flowing the plaintiff's land by means of a dam. It appeared that the company had kept up the water in their dam the entire year, under a claim of right, for about seven years, with the knowledge of the plaintiff and his grantors, and without objection on their part. It also appeared that during the same time the company had made expensive erections of mills and machinery to be operated by the power so gained. It was held that the acquiescence of the plaintiff and his grantors furnished good reason for refusing to exercise the summary power of granting an injunction. That decision is not in point here. The present proceeding is a suit at law. It is not an application to a court of equity to exercise the discretionary power of granting the extraordinary and summary remedy by injunction. Nor are the facts as to the plaintiff's acquiescence, or as to the defendants' change of position, shown to be similar to what was proved in *Bassett* v. *S. M. Co.*

There are decisions exempting municipal corporations from liability in civil actions for neglect to perform public duties. See *Eastman* v. *Meredith*, 36 N. H. 284; *Bigelow* v. *Randolph*, 14 Gray 541. There are also decisions exempting municipalities and some classes of public officers from liability for the manner of performing duties of a purely public or judicial nature. We do not propose to consider the intrinsic correctness of all the decisions which have proceeded upon these grounds (see DILLON, C. J., in *McCord* v. *High*, 24 Iowa 336, p. 350), for the principles upon which they are founded do not apply to the present defendants. The damage here complained of results from an act of commission, not omission. The defendants do not stand in the position of public bodies constituted for the sole purpose of executing a public trust or duty, in the performance of which they have no other interest than that which every citizen has. "True, the public benefit may be so far promoted by works authorized to be made by such corporations, that the property of individuals taken by them by virtue of their charters may be deemed to be taken for public use, within the constitutional provision on that subject; still, they exercise their corporate privileges under a private grant of the legislature, conferring upon

them specific powers for their own direct and private advantage." "They are trustees of public interests *for their own benefit.*" DAVI-SON, J., in *Evansville & Crawfordsville R. R. Co.* v. *Dick,* 9. Ind. 433, p. 435; ARCHER, C. J., in *Barron* v. *Mayor of Baltimore,* 2 Am. Jurist 213. The defendants voluntarily accepted their charter with a view to their own private emolument, and do not occupy the position of a municipality invested, without their consent, with powers to be exercised solely for the public benefit. If there can be any analogy between the liabilities of this railroad corporation and of a municipality, it is with reference to the liability of the latter for their manner of managing or dealing with property or rights held by them, "not for the direct and immediate use of the public," but for their own benefit in their corporate capacity. For injuries caused by the improper management or use of property thus held by them, municipal corporations "are liable to the same extent and in the same manner as private corporations and natural persons." Dillon on Municipal Corporations, sec. 780; PERLEY, C. J., in *Eastman* v. *Meredith,* 36 N. H. 284, pp. 295, 296; GRAY, J., in *Oliver* v. *Worcester,* 102 Mass. 489, pp. 500, 501; and see *Lowenthal* v. *Mayor of New York,* 61 Barb. 511, INGRAHAM, P. J., p. 520; Mr. Mitchell's note in 5 Am. Law Reg. N. S. 44 (explaining *Mills* v. *Brooklyn,* 32 N. Y. 489). We are not disposed to affirm the correctness of the decision in *Alexander* v. *Milwaukee,* 16 Wis. 247 (see the later case of *Pettigrew* v. *Village of Evansville,* 25 Wis. 223); but even in that decision, somewhat reluctantly made in deference to the supposed current of authority relative to municipal corporations, the court did not go to the extent of holding that a private corporation would not have been liable under similar circumstances. See COLE, J., p. 255; PAINE, J., pp. 257, 258. The cases which relate to the liability of municipalities for injuries caused in changing the grade of highways will be considered hereafter.

There are cases where an action against a corporation must fail, not because the defendants are a chartered body, but because the act complained of would not have been actionable if done by a private individual without legislative authority; the damage being remote, or being caused by "the reasonable use by another of his own property" *(damnum absque injuriâ).* "If my neighbor sets up a rival store or public house, he injures me, but I cannot sue him." So, if the public open a new road, "and thereby draw away custom from my hotel or my stage line, I have no remedy unless one is given by statute." See *Petition of Mt. Washington Road Co.,* 35 N. H. 134; *Fuller* v. *Edings,* 11 Rich. S. C. Law 239; S. C., 12 Rich. Law 504; *Richmond & Lexington Turnpike Road Co.* v. *Rogers,* 1 Duvall Ky. 135. "The removal of a county or State capital will often reduce very largely the value of all the property of the place from whence it was moved; but in neither case can the party injured * * * * * claim compensation from the public." Cooley's Const. Lim., 1st ed., 384. A railroad corporation, in erecting a fence upon their own land to prevent the snow from being blown upon their road, are merely making a proper and reasonable use of their

own property ; and, although such use may cause annoyance or damage to the adjacent land-owner, it gives him no cause of action. *Carson* v. *Western R. R.*, 8 Gray 423. *Waffle* v. *N. Y. Central R. R. Co.*, 58 Barb. 413, appears to have been decided upon the same principle ;—see, also, *Henry* v. *Vt. Central R. R.*, 30 Vt. 638, REDFIELD, J., p. 641 ; and *Greeley* v. *Maine Central R. R.*, 53 Me. 200. " Unless the particular injury would have been actionable before the company had acquired their statutory powers, it is not an injury for which compensation can be claimed." In cases where the defence of reasonable user is successfully maintained by corporations, " the defendants only ask that the same principle shall be applied to them as to individuals ;" they " only ask the same protection that an individual has." See WILLIAMS, C. J., in *Burroughs* v. *Housatonic R. R. Co.*, 15 Conn. 124, pp. 132, 133. In the case at bar the defendants ask something more. They claim that their statutory powers protect them from liability for the infliction of an injury, which would clearly have been actionable if done by a private person.

*Hatch* v. *Vt. Central Railroad Co.*, 25 Vermont 49, may be noticed in this connection. It was there decided that the defendants were not liable for the action of their embankment in causing the water, " upon the occasion of showers and melting of the snow," to flow into the plaintiff's store, provided the railroad " was built in a manner to do the plaintiff no unnecessary damage." We incline to think that, by the law as held in Vermont, the act complained of would not have been actionable if done by a private individual upon his own land, adjacent to the plaintiff's lot. In that State, no action is maintainable for obstructing or diverting water percolating through the soil—*Chatfield* v. *Wilson*, 28 Vermont 49 ; and it would not be unreasonable to infer that no action can be maintained there for so changing the level of the soil as to cause mere surface waters to pass into adjacent lots " in greater quantities or in other directions than they were accustomed to flow" (see Angell on Watercourses, 6th ed., sec. 108 *a, et seq.*, citing authorities not in entire accord with the decisions of our own court in *Swett* v. *Cutts*, 50 N. H. 439, and *Bassett* v. *Salisbury Manufacturing Co.*, 43 N. H. 569). Besides the damage caused by surface water, Hatch also claimed to recover on account of the obstruction to his business caused by the embankment in the street, and the running, &c., of trains thereon. The decision against him on that branch of the case is not in point here. So far as that part of Hatch's case was concerned, there was no physical interference with or encroachment upon his land. It did not appear that Hatch owned the fee in any part of the highway. When the case came up a second time (28 Vermont 142, p. 147), BENNETT, J., said,—" The case, then, does not call upon us to decide what would have been the rights of Hatch, if any, in case it had been shown that he owned the fee in the land to the centre of the highway." The physical consequences of the defendants' acts (apart from the matter of the surface water) did not extend beyond the limits of the highway, within which the plaintiffs had no proprietary interest.

It would seem that the legislature had attempted to grant to the corporation the right of crossing the highway, upon the " condition subsequent" of restoring the highway to its former state of usefulness, as near as might be, to the satisfaction of the selectmen or commissioners. As against Hatch, the corporation would appear to have had the right to build their track across the highway. Whether even the owner of the fee in the highway could have sued *the town* for building such an embankment, is a question which will be referred to hereafter.

*Richardson* v. *Vt. Central R. R. Co.*, 25 Vt. 465, is, upon the first point therein decided, an authority in favor of the present plaintiff. The second point decided in that case is similar to the point in *Hatch's case*, which was last discussed. The court expressly said, p. 472, that it did not appear that the fee in the soil of the highway belonged to the Richardsons, and that " the action was evidently not predicated or tried upon any such supposed state of facts." Whatever may be said as to some of the language of the court in these Vermont cases, the actual decisions on the points last named in each case are not necessarily in conflict with the result reached in the present case. Because an act which does not physically affect a lot of land is held not to be a " taking of the owner's property," it does not follow that such a physical injury to land as the present plaintiff complains of is not a " taking." If it should be conceded that no mere personal inconvenience, annoyance, or discomfort to a land-owner can amount to a taking of property, and that the legislature may constitutionally authorize the defendants to inflict such annoyances, these concessions do not dispose of the plaintiff's claim. He complains that the physical consequences of the defendants' acts extended beyond their land into his land; that his possession has been disturbed, his premises invaded, and his soil covered with foreign substances. The legislature may authorize a railroad corporation to do some acts, which, but for such authority, would be punishable as nuisances. But it does not follow that the legislative power in this direction is unlimited. On the contrary, the legislature are powerless when they attempt to pass " the limits prescribed by the constitution," and one of those limits is reached whenever the proposed act amounts to a taking of private property without compensation.

We come now to a class of cases, many of which might well have been placed under some of the preceding heads. They are what, for want of a better name, may be called " the highway grade cases," viz., unsuccessful actions against municipalities to recover damages alleged to have been sustained by adjacent land-owners in consequence of the grading of highways, or the changing of the grade, or the making of other alterations or improvements in highways. If the decisions in some of these cases are necessarily inconsistent with the conclusions reached in this opinion, still there is a large proportion of the cases of which this is not true. We think that many of these cases have been correctly decided, but that the courts have not always put the decision

upon the right ground. It is proposed to state briefly the grounds upon which we think that many of these cases might have been disposed of.

When land is taken in the first instance for a highway, the public pay for and acquire " complete control of the soil over which it passes, for all the purposes of its proper enjoyment and maintenance." Angell on Highways, 2d ed., sec. 202. " The rights of the public to the highway, for the legitimate purposes of travel and improving the road, are as perfect and absolute as the rights of a natural person are to his private property in lands " (dissenting opinion of BIRCHARD, J., in *McCombs* v. *Town Council of Akron*, 15 Ohio 474, p. 481). If a private land-owner lowers the grade of his own lot, and does not thereby cause his neighbor's soil (which has no artificial weight upon it) to break away, " and slide down of its own weight," no action will lie. So, if he raises the grade of his own lot, without placing or causing to be placed any foreign substance upon his neighbor's lot, his neighbor has no legal remedy against him. His acts may render the occupation of the neighboring lot less convenient; but he has simply exercised his right to make a reasonable use of his own land, and his neighbor has a corresponding or correlative right to do acts of the same nature on *his* land. In like manner, when a town lower or raise the grade of a street, without thereby undermining, or invading, or causing foreign substances to be placed upon the soil of the adjacent owner, or in any way disturbing such owner's possession, they are only making a reasonable use of their proprietary rights. " No consequences flow from their acts that would have made a natural person liable had he been the owner and performed the same acts." BIRCHARD, J., *ubi supra*, p. 482. Without touching the adjacent owner's lot, or in any way encroaching upon it, the town " had as clear and perfect authority to raise its street higher or sink it lower than the level of his lot, as he would undoubtedly have had to elevate, or sink his ground, without touching or otherwise injuring or interfering with the public street." ROBERTSON, C. J., in *Keasy* v. *Louisville*, 4 Dana 154, p. 155. In such a case there is no encroaching upon the soil of the adjacent owners, " or invading their dominion." " Not a shovel full of earth was taken from it or thrown upon it. There stands their property, within its proper limits, as it stood before ; " *per curiam*, in *Henry* v. *Pittsburgh, &c., Co.;* 8 Watts & Serg. 85, p. 86. Towns are " not bound to grade and improve, or pay for grading and improving, the adjacent lots of private persons, so as to make them correspond with the street." SPOFFORD, J., in *Reynolds* v. *Shreveport*, 13 Louisiana Ann. 426, p. 427. When, then, the acts of the town have been done within the limits of the highway, and do not produce any physical effect or change without those limits, neither taking anything from the soil of the adjacent lots, or superimposing anything upon that soil which was not there before, there is no question of constitutional law involved. The town have only made the same reasonable use of their property that every private owner may make of his property. " The rights of the

public in property are to be governed by the same rules of law as the rights of individuals." HAILE, J., in *Rounds* v. *Mumford*, 2 R. I. 154, p. 162. If the soil of the highway was originally taken from the complaining adjacent owners, or from their grantors, they have already been compensated for the damage; for it must be presumed that the possibility of such future changes in the highway was taken into account in the original assessment of damages upon the laying out. If, on the other hand, the highway was built over land taken from another proprietor, the town have done nothing more than that original proprietor might have done with impunity if he had still continued in the exclusive ownership of the land.

Among the cases where we think that the decision may well stand upon the ground of reasonable user of public property, and where, therefore, the result actually reached (i. e., the exemption of the municipality from liability) is not inconsistent with the present decision, are the following: *Humes* v. *Mayor, &c., of Knoxville*, 1 Humphrey Tenn. 403; *Rounds* v. *Mumford*, 2 Rhode Island 154; *Callender* v. *Marsh*, 1 Pick. 418; *Roberts* v. *Chicago*, 26 Illinois 249; *Macy* v. *Indianapolis*, 17 Indiana 267; *Creal* v. *Keokuk*, 4 G. Greene (Iowa) 47; *Reynolds* v. *Shreveport*, 13 Louisiana Ann. 426; *Hoffman* v. *St. Louis*, 15 Missouri 651; *Benedict* v. *Goit*, 3 Barb. 459; *Simmons* v. *City of Camden*, 26 Arkansas 276; *Keasy* v. *Louisville*, 4 Dana 154. We are also inclined to enumerate, under the same head, *Henry* v. *Pittsburgh, &c., Co.*, 8 Watts & Serg. 85; *Reading* v. *Keppleman*, 61 Penn. St. 233; *Green* v. *Reading*, 9 Watts 382; *Snyder* v. *Rockport*, 6 Indiana (Porter) 237; *Slatten* v. *Des Moines Valley R. R. Co.*, 29 Iowa 148 (where the defendants justified under a city ordinance; see COLE, C. J., p. 156). See, also, in this connection, EDWARDS, J., in *Waddell* v. *Mayor of New York*, 8 Barb. 95, p. 99; *Whittieer* v. *Portl. & Ken. R. R.*, 38 Maine 26. We think it quite apparent that *Towle* v. *Eastern R. R.*, 17 N. H. 519 (see, also, 18 N. H. 547), may well be classed under this head. The defendants acted under the order of the town, and the act directed by the town was one for which a private owner would not have been held answerable. See, also, the remarks of PARKER, C. J., p. 523, suggesting the further distinction that the act there complained of was not the voluntary act of the defendants, done for purposes of their own convenience and benefit.

The Massachusetts decisions, which exempt towns from liability for the flow of surface water from the highway on to premises adjacent to the highway *(Flagg* v. *Worcester,* 13 Gray 601; *Turner* v. *Dartmouth*, 13 Allen 291;—see, also, *Dickinson* v. *Worcester*, 7 Allen 19), give towns no greater rights or immunities in this respect than individual proprietors have in that State. (See *Gannon* v. *Hargadon*, 10 Allen 106; *Bates* v. *Smith*, 100 Mass. 181.) " In this respect," said MERRICK, J., 13 Gray 603, " the rights of towns and of the owners of land adjoining a highway are not dissimilar to those of coterminous proprietors of land." (And, in *Franklin* v. *Fish*, 13 Allen 211, it was held, that while the public may raise the level of their travelled path and

thus cause the surface water to flow upon the land of an adjacent owner, the adjacent owner may also raise his land to prevent this effect. See, also, *Bangor* v. *Lansil,* 51 Me. 521, p. 525 ; Angell on Watercourses, 6th ed., secs. 108, *l,* 108, *m.) Hoyt* v. *City of Hudson,* 27 Wis. 656, stands upon the same ground as the Massachusetts cases,—the court holding that a private proprietor could have done what the city did, and that " cities, towns, and villages, as the owners of lands for highways and other public purposes, have the same right to obstruct or repel the flow of surface water as other proprietors." DIXON, C. J., p. 660. (See, in this connection, *Pettigrew* v. *Village of Evansville,* 25 Wis. 223, where the defendants' acts were held unjustifiable.) In *Taylor* v. *St. Louis,* 14 Mo. 20, an alley had been dedicated to the public by the plaintiffs or their ancestors ; and NAPTON, J., said that the probability of its being graded, when the public interest required it, must have been calculated on when the buildings were erected.

We do not assert that *all* the "highway grade cases," where municipalities have been exempted from liability, could have been decided on the foregoing ground of reasonable user of public property. But a considerable proportion of the remaining cases of this class are very near the border line in this respect ; and, without a fuller statement of facts, or a perfect knowledge of the law in each jurisdiction relative to the construction given to the right of reasonable user on the part of individual proprietors (particularly in reference to surface water), it is difficult to determine on which side of the line some of the cases belong. We do not feel certain that the following cases could not have been decided on the above ground of reasonable user. *O' Connor* v. *Pittsburgh,* 18 Penn. St. 187 ; *Rome* v. *Omberg,* 28 Ga. 46 (see LUMP-KIN, J., pp. 47, 49); *Roll* v. *Augusta,* 34 Ga. 326 ; *St. Louis* v. *Gurno,* 12 Mo. 414 ; *White* v. *Corporation of Yazoo City,* 27 Miss. 357 ; *Clark* v. *City of Wilmington,* 5 Harr. Del. 243, p. 244 ; *Wilson* v. *Mayor of New York,* 1 Denio 595 ;—see, also, *Carr* v. *Northern Liberties,* 35 Penn. St. 324 ; Angell on Watercourses, 6th ed., secs. 108, *l,* 108, *m.* In the oft-quoted case of *Radcliff's Ex'rs* v. *Mayor of Brooklyn,* 4 Comst. (N. Y.) 195, some of the views of BRONSON, J., are in direct conflict with the present decision (see 4 Comstock 197, 198, 203–208) ; but no less than five pages of the opinion are occupied in attempting to establish the position that the corporation of Brooklyn had done nothing more than a private owner might lawfully have done in the exercise of the same proprietary rights. If this last position does not accord with the current of authority, still the fact that it was the opinion entertained by BRONSON, J., in that case, may have induced a less careful consideration by that eminent judge of the other grounds of the decision, which were wholly unnecessary if the above position was well taken.

The case of *Benden* v. *Nashua,* 17 N. H. 477, was decided in 1845, but the volume of reports in which it is contained was not published until 1864. In 1855, SAWYER, J., in delivering the opinion in *Ball* v. *Winchester,* 32 N. H. 435, p. 441, undertook to state the questions

which had been raised and decided in *Benden* v. *Nashua.* As SAWYER, J., was, in 1845, a member of the bar, residing in Nashua (or Nashville), it is quite probable that he heard the court announce the decision in *Benden* v. *Nashua*; and we think that his recollection, ten years afterwards, of the grounds of the decision as then stated by the court, may have been as accurate as the recollection of PARKER, C. J., after nearly double that space of time. In *Ball* v. *Winchester*, SAWYER, J., says, pp. 441, 442, that the injuries complained of in *Benden* v. *Nashua* were occasioned " by causing the rain-water to flow into the house, and also by creating an embankment immediately in front of it ;" and that " in the reasoning of the court upon the case, the decision was placed upon the ground that the town could not be held answerable for the acts of the surveyor ; and, also, upon the ground that for such consequential damages as might result to the owner of the adjoining land from the improvements which the public accommodation required to be made in the highways, the compensation must be presumed to have been made in the award of damages for the land taken for the highway." If the foregoing is a correct statement of the grounds of that decision, they are not necessarily inconsistent with the present conclusion. If, on the other hand, the reported opinion in 17 N. H. correctly indicates the views then taken by the court, it nevertheless admits of question whether the case could not have been decided upon the ground of reasonable user. As the law is now settled by the decision in *Swett* v. *Cutts*, 50 N. H. 439, the question of reasonable user as to the flow of surface water might be for the jury. *Ball* v. *Winchester*, 32 N. H. 435, is not in point. In that case, the court held that the acts of the surveyor were not the acts of the town, and that the town were not liable to the plaintiff for neglect to perform the duty of keeping the highway in repair.

Without reviewing all the cases on this topic (see *Smith* v. *Washington*, 20 How. 135 ; *Lafayette* v. *Spencer*, 14 Ind. 399 ; *Vincennes* v. *Richards*, 23 Ind. 381 ; *Plum* v. *Morris Canal & Banking Co.*, 2 Stockton Ch. N. J. 256 ; and other cases collected in Dillon on Municipal Corporations, sec. 783, note 1), it is quite clear to our minds that *the judgments rendered* in a very considerable proportion of them are not necessarily irreconcilable with our conclusions in the case at bar.

So far as the decisions in any of these " highway grade cases " are absolutely inconsistent with the present opinion, we are not disposed to acquiesce in them, nor to decide this case upon their authority. That authority has been somewhat weakened by the dissatisfaction expressed by some judges at the harshness and injustice of the decisions which they have felt compelled to make (see *O'Connor* v. *Pittsburgh*, 18 Penn. St. 187 ; WOODWARD, J., in *in re Ridge St.*, 29 Penn. St. 391, p. 395 ; KINNEY, J., in 4 G. Greene (Iowa) 47, p. 52) ; also, by the fact that the manifest hardship thus engendered has led, in more than one instance, to legislative enactments for the protection of adjacent land-owners (see, in our own State, the statute of 1848, chap. 725, prob-

ably passed in consequence of the decision in *Benden* v. *Nashua, ubi supra.)* If these decisions were intrinsically correct, it might be desirable to consider further the question already adverted to, whether the position of these defendants is analogous to that of a municipal corporation. But we think that decisions, which go to the length of exempting municipalities from liability for the infliction of injuries like the present, are erroneous in principle. If, in the repair of highways, there is a physical interference with land outside the limits of the highway, a substantial taking away of the soil of the adjacent owner, or an imposition of foreign substances upon it so as to amount to a substantial abridgment of his right of exclusive user, the mere fact that the injury is done by a town or city ought not to deprive the land-owner of all redress. The opposite view " places individual property * * * * at the mercy of municipal power." " We can solve more easily and safely questions of this character, if we take pains to free our minds from the false notion that a municipality has some indefinable element of sovereign power, which takes from the property of the citizen, as against its aggressions, the protection enjoyed against the aggressions of a natural person." The same constitutional provision that protects the right of private property against invasion by private individuals, " must protect it from similar aggression on the part of municipal corporations." LAWRENCE, J., in *Nevins* v. *City of Peoria*, 41 Ill. 502, pp. 508, 509, 510. " It is said that the city must grade streets and direct the flow of waters as best it can for the interests of the public. Undoubtedly ; but if the public interest requires that the lot of an individual shall be rendered unfit for occupancy, either wholly or in part," by placing something on the soil, or by taking from the soil, " in this process of grading or drainage, why should not the public pay for it, to the extent to which it " thus " deprives the owner of its legitimate use. Why does not the constitutional provision apply as well to secure the payment for property partially taken for the use or convenience of a street, as when wholly taken and converted into a street ? Surely the question of the degree to which the property is taken can make no difference in the application of the principle. To the extent to which the owner is " thus substantially " deprived of its legitimate use, * * * to that extent he should be paid." LAWRENCE, J., *ubi supra*, p. 511. The intrinsic correctness of the views just expressed is strongly maintained by the reasoning of Mr. Angell in his work on Highways, 2d ed., sec. 211. It is also supported, in some degree, by the last paragraph in sec. 799 of Dillon on Municipal Corporations, and by the decision in *Pettigrew* v. *Village of Evansville*, 25 Wis. 223. See, also (besides *Nevins* v. *Peoria, ubi supra*), *Louisville* v. *Rolling Mill Co.*, 3 Bush. Ky. 416 ; *McCord* v. *High*, 24 Iowa 336, BECK, J., p. 342, DILLON, C. J., p. 350 ; dissenting opinion of BIRCH, J., in *St. Louis* v. *Gurno*, 12 Mo. 414, p. 424. (There are also cases in Ohio, cited in Dillon on Municipal Corporations, sec. 783, note 1, some of which would seem to impose a greater degree of liability on municipal corporations than it is necessary for the plaintiff in this case

to contend for as against a railroad corporation.  See, also, 2 Kent's Com. 414, note *b.)*

No one can read these "highway grade cases" without perceiving how much American courts have relied upon the English authorities as establishing the position that the formal enactment of a statute purporting to authorize the doing of an act always affords a complete justification to the doer.  The fallacy of assuming that our State legislatures possess the practically omnipotent powers of the British parliament, or that they pass none but constitutional statutes, has already been exposed.  It is, however, worth remark, that the English case most frequently cited in these American decisions *( Gov. & Co. of the British Cast Plate Manufacturers* v. *Meredith,* 4 Term 794) was one which, it seems to us, might well have been decided on the ground that the paving commissioners had simply made the same reasonable use of public property that an individual might lawfully have made of his private property ; that they had done nothing more in the street than a private individual might do with impunity upon his own land.

By the foregoing review of authorities, it appears that the number of actual decisions in irreconcilable conflict with the present opinion is much smaller than has sometimes been supposed, and that, in a large proportion of the cases cited, the application of the principles here maintained would not have necessitated the rendition of a different judgment from that which the courts actually rendered in those cases.

Thus far Eaton's case alone has been under consideration.  The only difference between Eaton's case and Aiken's case arises from the fact that a small part of the ridge is included in Aiken's farm, while none of it is on the farm of Eaton.  This difference does not affect the present inquiry, which relates solely to the correctness of the ruling at the trial.  The court did not rule that Aiken could recover the damages occasioned to him by the entire cut through the ridge.  The ruling was carefully limited to " such damages as have been caused " the plaintiffs " in consequence of the defendants' cutting away the ridge north of the plaintiffs' farms."  If any damage was caused to Aiken by the defendants' removing any portion of that " small part " of the ridge which was included in his farm, he is not entitled to recover for it under this ruling.  So far, then, as the correctness of the ruling is concerned, Aiken's case stands on the same legal principle as Eaton's.  Under this ruling it will be for a jury to say how much of the injury to Aiken's meadow was occasioned by the removal of that part of the ridge which was north of Aiken's farm.

In both cases the exception is overruled.  As the defendants elect trial by jury, the order must be,

*Case discharged.*